Bozena C. FOX, Plaintiff,

v.

MCI COMMUNICATIONS CORP. and MCI Telecommunications Corp., Delaware corporations, Defendants.

No. 950280.

Supreme Court of Utah.

Feb. 4, 1997.

Jerome H. Mooney, Alan E. Barber, Salt Lake City, for plaintiff.

Janet Hugie Smith, Lisa Yerkovich, Salt Lake City, and William L. Kasley, Karen Helen Peteros, San Francisco, CA, for defendants.

STEWART, Associate Chief Justice:

Bozena C. Fox filed suit in the United States District Court for the District of Utah against her former employer MCI Telecommunications Corporation ("MCIT") for wrongful termination of her employment. This case is here pursuant to Rule 41 of the Utah Rules of Appellate Procedure to decide an issue of law that was certified to this Court by the District Court.

Between 1987 and 1992, Fox worked as a sales representative for MCIT in its Salt Lake City office. In 1992, Fox observed that other employees were engaging in a practice known as churning—making existing customer accounts appear new on the corporate records so that they could meet sales quotas and earn higher commissions. MCIT's sales commission policies and employee agreements prohibited such practices. Fox did not engage in these practices. Fox alleges that the prohibited practices and the failure of MCIT's management to correct them could constitute computer-assisted fraud in violation of Utah Code Ann. § 76–6–703 and § 76–6–705 or acts of fraud or embezzlement under § 76–6–403, § 76–6–405, and § 76–2–204 (corporate responsibility).

When Fox reported the practices to MCIT's management, she was told to "mind her own business" and to ignore the account churning. Nevertheless, Fox thereafter reported the practices to MCIT's Internal Audit Unit, which visited Fox and confirmed that the practices were occurring in the Salt Lake City office. Less than one week after MCIT's Internal Audit Unit concluded its investigation, the company terminated her employment. Fox alleges that MCIT terminated her employment in retaliation for reporting the alleged account churning to MCIT's management and Internal Audit Unit. For the purpose of answering the question certified to us, we take that allegation to be true.

Fox's complaint against MCIT asserted that MCIT's termination of her employment was wrongful because the company's reason for discharging her violated Utah public policy, i.e., her discharge was in retaliation for disclosing to corporate officials the illegal conduct of her co-workers that could injure the interests of the public and MCIT's stockholders.

MCIT moved to dismiss Fox's wrongful termination claim on the ground that her factual allegations, even if true, did not violate a clear and substantial Utah public policy and therefore her termination was lawful. The district court granted the motion without prejudice, and Fox filed a second amended complaint alleging the same claim for relief. MCIT again moved to dismiss for failure to state a claim. In response, United States District Court Judge Bruce S. Jenkins certified the following question to this Court:

Does the termination of a private sector employee in retaliation for the good faith

reporting to company management of the alleged violation by one or more co-workers of Utah Code Ann. §§ 76–6–403, 76–6–404, 76–6–703, or 76–6–705 (1995), implicate "a clear and substantial public policy" of the State of Utah?

## I. ANSWER

■ The answer is no: the termination of a private sector employee in retaliation for the good faith reporting to company management of alleged violations by co-workers of Utah Code Ann. §§ 76–6–403, 76–6–405, 76–6–703, or 76–6–705 (1995),[1] does not implicate a clear and substantial public policy of the state of Utah.

## II. LIMITATIONS ON TERMINATION OF EMPLOYEES UNDER AT–WILL EMPLOYMENT CONTRACTS

■ The general rule is that an employment relationship for an indefinite time gives rise to a contractual arrangement that allows both the employer and the employee to ter-minate the employment for any reason and allows the employer to do so without extending any procedural safeguards to an employee, except as required by law. *See Bihlmaier v. Carson,* 603 P.2d 790, 792 (Utah 1979); *see also Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 53 (Utah 1991); *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1044 (Utah 1989). The general rule is not, however, a rule of contract construction; it is only a presumption that an employment relationship "which has no specified term of duration is an at-will relationship," *Berube,* 771 P.2d at 1044, but that presumption is subject to a number of limitations. An at-will employee may overcome that presumption by demonstrating that (1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of another agreed-upon condition; (2) a statute or regulation restricts the right of an employer to terminate an employee under certain conditions;[2] or (3) the termination of employment constitutes a violation of a clear and substantial public policy.[3] *Retherford v. AT & T Communications,* 844 P.2d 949, 958–

---

**1. 76–6–403. Theft—Evidence to support accusation.**

Conduct denominated theft in this part constitutes a single offense embracing the separate offenses such as those heretofore known as larceny, larceny by trick, larceny by bailees, embezzlement, false pretense, extortion, blackmail, receiving stolen property. An accusation of theft may be supported by evidence that it was committed in any manner specified in Sections 76–6–404 through 76–6–410, subject to the power of the court to ensure a fair trial by granting a continuance or other appropriate relief where the conduct of the defense would be prejudiced by lack of fair notice or by surprise.

**76–6–405. Theft by deception.**

(1) A person commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof.

(2) Theft by deception does not occur, however, when there is only falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed. "Puffing" means an exaggerated commendation of wares or worth in communications addressed to the public or to a class or group.

**76–6–703. Computer crimes and penalties.**

. . . .

(3) A person who uses or knowingly allows another person to use any computer, computer network, computer property, or computer sys-tem, program, or software to devise or execute any artifice or scheme to defraud or to obtain money, property, services, or other things of value by false pretenses, promises, or representations, is guilty of a felony of the second degree.

**76–6–705. Reporting violations.**

Every person, except those to whom a statutory or common law privilege applies, who has reason to believe that the provisions of Section 76–6–703 are being or have been violated shall report the suspected violation to the attorney general, or county attorney, or, if within a prosecution district, the district attorney of the county or prosecution district in which part or all of the violations occurred.

**2.** *See* Clark W. Sabey, Note, *Scalpels and Meat Cleavers: Carving a Public Policy Limitation to the At–Will Employment Doctrine,* 1993 Utah L.Rev. 597, 599–600 & n. 28.

**3.** Some states have adopted an additional restriction on the right of employers to terminate at-will employees by construing employment contracts as containing an implied covenant of "good faith and fair dealing," violation of which is actionable. *See* Sabey, *Public Policy Limitation* at 600 n. 33. This Court has expressly rejected that proposition. *Brehany,* 812 P.2d at 53.

59 (Utah 1992); *Heslop v. Bank of Utah,* 839 P.2d 828, 836–38 (Utah 1992); *Peterson v. Browning,* 832 P.2d 1280, 1281–82 (Utah 1992); *Hodges v. Gibson Prods. Co.,* 811 P.2d 151, 165 (Utah 1991).

▮▮▮ A wrongful termination case based on a violation of an express or implied term of the employment agreement rests on a duty that an employer voluntarily undertakes as a consequence of the employment agreement itself, whether express or implied. A wrongful termination case based on contravention of public policy is founded on a tort duty that exists irrespective of the parties' agreement. *Peterson,* 832 P.2d at 1284–85; *see also, e.g., Hodges,* 811 P.2d at 165; *Foley v. Interactive Data,* 47 Cal.3d 654, 254 Cal. Rptr. 211, 765 P.2d 373, 377 (1988) (en banc).

▮▮▮ The term "public policy" is so broad in the abstract that it eludes a reasonably precise definition for legal purposes. *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1042 (Utah 1989). Furthermore, not every employment termination that has the effect of violating some public policy is actionable. A public policy whose contravention is achieved by an employment termination must be "clear and substantial" to be actionable. *Retherford,* 844 P.2d at 966 n. 9; *Heslop,* 839 P.2d at 837; *Berube,* 771 P.2d at 1042. While the term "clear and substantial" adds little by way of specific guidance, a more precise definition of the term must await the time when this Court has had sufficient experience with a number of cases so that we can deduce from our experience more precise standards that give specific content to the term "public policy."

We have acknowledged that the enforcement of a state's criminal code constitutes a clear and substantial public policy. *Hodges,* 811 P.2d at 166; *see also Belline v. K–Mart Corp.,* 940 F.2d 184, 187 (7th Cir.1991). In *Hodges,* this Court observed:[4]

Most criminal statutory prohibitions provide narrow and clear-cut definitions of a specific public policy designed to protect both society at large and specific individuals from antisocial acts. The law ought not to allow those prohibitions to be circumvented by employers who seek to secure an objective prohibited by the criminal law while avoiding a technical violation of the law because of the means used. When the means used to accomplish a prohibited end, that is, the discharge of an employee, runs counter to public policy, an action for wrongful discharge is an appropriate way to protect both the public interest and the employee from an employer's oppressive use of power.

811 P.2d at 166.

*Hodges* held that a discharged employee had an action for wrongful termination where the employee was fired for refusing to comply with extortionate demands by the employer and the employer made false accusations of criminal conduct by the employee to a prosecutor. *Peterson,* 832 P.2d 1280, followed *Hodges* and held that an employer who fired an employee for refusing to provide false information on tax and customs forms could be held liable for wrongful termination. Although the employee's conduct would apparently have been illegal under federal law and the law of Missouri but not under Utah law, the Court nevertheless held:

Persons who are terminated from their employment because they refuse to engage in illegal activities that implicate clear and substantial Utah public policy considerations should be protected regardless of whether the applicable law is that of Utah, the federal government, or another state. The effect on the employee of having to choose between keeping his job or following the law that governs him is the same regardless of the origin of the law. Accordingly, we hold that an attempt to coerce an employee to violate the state tax law and federal customs statute at issue contravenes the clear and substantial pub-

---

4. The quoted part of the opinion in *Hodges* was specifically concurred in by only two justices, Justice Stewart and Justice Durham. Because Justice Howe concurred in the result in sustaining the wrongful termination claim based on a violation of the criminal law, the language quoted is therefore from a plurality opinion. Nevertheless, the point stated is consistent with the underlying doctrine in *Heslop v. Bank of Utah,* 839 P.2d 828 (Utah 1992), and *Peterson v. Browning,* 832 P.2d 1280 (Utah 1992).

lic policies of the state of Utah. Thus, a discharge resulting from an employee's refusal to violate such laws is actionable under the public policy limitation.

832 P.2d at 1283 (footnotes omitted).

Other courts have recognized an employee's tort action for wrongful termination resulting from the employee's refusal to engage in criminal conduct at the direction of the employer. *See, e.g., Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (employee refused to engage in acts prohibited by antitrust laws); *Petermann v. International Bhd. of Teamsters,* 174 Cal.App.2d 184, 344 P.2d 25 (1959) (employee, a union business agent, discharged because he refused to testify falsely to a state legislative committee).

The public policies embedded in the criminal laws have long been deemed of such importance that the law also encourages persons to report criminal activity to public authorities.[5] Accordingly, an employee has also been held to have a cause of action for wrongful termination based on termination of the employee for reporting criminal activity to public authorities. Such rulings recognize the long-established proposition that public policy encourages citizens to report crimes. *See In re Quarles & Butler,* 158 U.S. 532, 533–35, 15 S.Ct. 959, 960–61, 39 L.Ed. 1080, 1080–81 (1895); *Lachman v. Sperry–Sun Well Surveying Co.,* 457 F.2d 850, 853 (10th Cir.1972) ("[I]t is public policy ... everywhere to encourage the disclosure of criminal activity."). Effective implementation of that policy requires the cooperation of citizens possessing knowledge thereof. *See, e.g., Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876, 879–80 (1981); *Garibaldi v. Lucky Food Stores, Inc.,* 726 F.2d 1367, 1374 (9th Cir. 1984).

■ However, if an employee reports a criminal violation to an employer, rather than to public authorities, and is fired for making such reports, that does not, in our view, contravene a clear and substantial public policy. In the instant case, the employer did not require plaintiff to engage in a criminal act or to violate her public duty to disclose criminal conduct. The conduct that plaintiff's co-workers engaged in was dishonest, but it did not cause harm to any of MCIT's customers; no customer was overcharged or defrauded as a result of the dishonest practices of MCIT's employees. The churning and creation of "new" accounts, while clearly intended to produce higher pay for the employees, was a practice defendant knew about and, by tolerating it, acquiesced in. For that reason, the corporation was not defrauded.

Although employees may have a duty to disclose information concerning the employer's business to their employer, that duty ordinarily serves the private interest of the employer, not the public interest. *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 380 (1988). Nothing in this case affects the public interest in any significant way. The conduct of plaintiff's co-workers may have resulted in increased costs of the corporation's products and services and thereby adversely affected the corporate shareholders to some minor degree, but that does not violate a clear and substantial public policy. Nor would the effect of the increased costs on the corporation's prices result in a violation of a clear and substantial public policy. There are, no doubt, many instances of avoidable inefficiencies that produce higher costs and affect an employer's profits, but, for the most part, those are matters that involve private policy that is more or less regulated by forces in the marketplace, not matters that rise to a level that implicates a clear and substantial public interest.

*Foley v. Interactive Data Corp.* is similar on its facts to the instant case. There an employee informed a corporate officer of suspected criminal activity by one who was to be hired as the employee's supervisor. As a result of his disclosure, the employee was fired after the supervisor was hired. The California Supreme Court held that irrespective of whether the employee had a legal duty to report to his employer information relevant to the employer's business, there

---

**5.** Utah Code Ann. § 76–6–705 expressly requires persons having knowledge of computer crimes specified in section 76–6–703 to report such crimes to public authorities.

was no "substantial public policy prohibiting an employer from discharging an employee for performing that duty." 254 Cal.Rptr. 211, 765 P.2d at 380. The Court reasoned:

The absence of a distinctly "public" interest in this case is apparent when we consider that if an employer and employee were *expressly* to agree that the employee has no obligation to, and should not, inform the employer of any adverse information the employee learns about a fellow employee's background, nothing in the state's public policy would render such an agreement void. By contrast, in the previous cases asserting a discharge in violation of public policy, the public interest at stake was invariably one which could not properly be circumvented by agreement of the parties. For example, in *Tameny,* supra, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, a contract provision purporting to obligate the employee to comply with an order of the employer directing the employee to violate the antitrust laws would clearly have been void as against public policy, and in *Petermann,* supra, 174 Cal. App.2d 184, 344 P.2d 25, a contract provision which purported to obligate the employee to commit perjury at the employer's behest would just as obviously have been invalid. Because here the employer and employee could have agreed that the employee had no duty to disclose such information, it cannot be said that an employer, in discharging an employee on this basis, violates a fundamental duty imposed on all employers for the protection of the public interest.

765 P.2d at 380 n. 12.

There is, of course, a difference between the facts in *Foley* and the facts in this case. Here there is ongoing conduct of questionable legality and honesty by co-employees. In *Foley,* the employee reported information concerning the possibility of illegal conduct of an employee prior to employment. In the instant case, the impact of the reported conduct on the corporation was more direct and more significant because it apparently occurred in the company on a nationwide basis. Nevertheless, the problem was one for corporate management to resolve, irrespective of whether management's allowing the misconduct had some justification in a rational corporate policy, or simply occurred by corporate indifference, or was the subject of a forthcoming corrective policy. Although it would seem that a business ought to welcome an employee's disclosure of significant employee misconduct, especially on such a broad scale as occurred here, nevertheless, we do not find the requisite basis for a court's interfering with management's decisions regarding such misconduct by nullifying the company's right to terminate plaintiff's employment for disclosure of such misconduct. The dispositive conclusion is that MCIT's action did not contravene a clear and substantial public policy.

In sum, even though an employee may have a duty to report information concerning the employer's business to the employer, retaliatory termination for the reporting of possible criminal conduct by co-workers to the employer does not give rise to a violation of the clear and substantial public policy of enforcing the criminal law.

ZIMMERMAN, C.J., and HOWE, DURHAM and RUSSON, JJ., concur in Associate Chief Justice STEWART's opinion.