2006 UT 71

**Marilyn TOUCHARD, et al., Plaintiffs and Respondents,**

v.

**LA–Z–BOY INC., Defendant and Petitioner.**

No. 20050361.

Supreme Court of Utah.

Nov. 17, 2006.

Erik Strindberg, Ralph E. Chamness, Salt Lake City, for respondent.

Jathan W. Janove, Salt Lake City, for petitioner.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 We accepted the following question on certification from the United States District Court for the District of Utah: "Whether the termination of an employee in retaliation for the exercise of rights under the Utah Workers' Compensation Act ... implicates a 'clear and substantial public policy' of the State of Utah that would provide a basis for a claim of wrongful termination in violation of public policy." If we .conclude that it does, the federal court then asks whether the cause of action applies (1) when "the employee is not fired but resigns under circumstances that constitute a 'constructive discharge' "; (2) when "the employee who has filed for benefits under the [Workers' Compensation Act] is neither fired nor constructively discharged, but experiences other discriminatory treatment or harassment from an employer"; or

(3) when "the employee has not filed for benefits under the [Workers' Compensation Act] but is retaliated against for opposing an employer's treatment of other injured employees who are entitled to file for benefits under the [Act]." We hold that retaliatory discharge for filing a workers' compensation claim violates the public policy of this state; thus, an employee who has been fired or constructively discharged in retaliation for claiming workers' compensation benefits has a wrongful discharge cause of action. We decline to extend this cause of action, however, to an employee who has suffered only harassment or discrimination or to an employee who has been retaliated against for opposing an employer's treatment of employees who are entitled to claim workers' compensation benefits.

### ANALYSIS

■ ¶ 2 When a federal court certifies a question of law to this court, we "are not presented with a decision to affirm or reverse." *Robert J. DeBry & Assocs. v. Qwest Dex, Inc.*, 2006 UT 41, ¶ 11, 144 P.3d 1079. Consequently, "traditional standards of review do not apply." *Id.* Moreover, "[o]n certification, we 'answer the legal questions presented' without 'resolving the underlying dispute.'" *In re Kunz*, 2004 UT 71, ¶ 6, 99 P.3d 793 (quoting *Spackman ex rel. Spackman v. Bd. of Educ.*, 2000 UT 87, ¶ 1 n. 2, 16 P.3d 533). We therefore proceed directly to our analysis of Utah law.

■ ¶ 3 Under Utah law, all employment relationships "entered into for an indefinite period of time" are presumed to be at-will. *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 7, 96 P.3d 950. When employment is at-will, either "the employer or the employee may terminate the employment for any reason (or no reason) except where prohibited by law." *Id.* Accordingly, an employer's decision to terminate an employee is presumed to be valid. *Id.* A discharged employee can overcome this presumption in three narrow situations by showing that

"(1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of [some] agreed-upon condition; (2) a statute

or regulation restricts the right of an employer to terminate an employee under certain conditions; or (3) the termination of employment constitutes a violation of a clear and substantial public policy."

*Id.* (alteration in original) (quoting *Fox v. MCI Commc'ns Corp.*, 931 P.2d 857, 859 (Utah 1997)).

■ ¶ 4 The federal court's questions invoke the public policy exception to the at-will rule. We have stated that "all employers have a duty not to terminate any employee, 'whether the employee is at-will or protected by an express or implied employment contract,' in violation of clear and substantial public policy." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 404 (Utah 1998) (quoting *Retherford v. AT & T Commc'ns of the Mountain States, Inc.*, 844 P.2d 949, 960 (Utah 1992)). "If an employer breaches that duty, an employee has a tort cause of action against the employer" for wrongful discharge. *Id.*

¶ 5 We thus begin our analysis by answering the federal court's first question: whether the termination of an employee for "the exercise of rights under the Utah Workers' Compensation Act . . . implicates a 'clear and substantial public policy'" that gives rise to a wrongful termination claim.

I. AN EMPLOYEE WHO HAS BEEN TERMINATED FOR EXERCISING RIGHTS UNDER THE WORKERS' COMPENSATION ACT HAS A WRONGFUL DISCHARGE CAUSE OF ACTION

¶ 6 A discharged employee has a cause of action under the public policy exception if his or her termination violated a "clear and substantial" public policy. *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 7, 96 P.3d 950. We have previously identified four categories that invoke a "clear and substantial public policy": (1) discharging an employee for "refusing to commit an illegal or wrongful act"; (2) discharging an employee for "performing a public obligation"; (3) discharging an employee for "exercising a legal right or privilege"; and (4) discharging an employee for reporting an employer's criminal activities to

the appropriate authorities. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 408 (Utah 1998).

¶ 7 We have not yet had the opportunity to consider whether retaliatory discharge for claiming workers' compensation benefits falls under one of the public policy categories. We did mention workers' compensation claims as an example of the third category in *Ryan*, 972 P.2d at 408, but the issue was not before us in that case, nor had it been decided in any prior case. Thus, *Ryan* did not conclusively establish that claiming workers' compensation benefits constituted the exercise of a legal right or privilege for purposes of the public policy exception to the at-will rule. We now conduct that analysis.

¶ 8 Under the Utah Workers' Compensation Act (the Act), Utah Code Ann. §§ 34A–2–101 to –905 (2005 & Supp.2006), "[a]n employee ... who is injured ... by accident arising out of and in the course of the employee's employment" is entitled to compensation pursuant to the provisions of the Act. *Id.* § 34A–2–401(1) (2005); *see also id.* § 34A–2–105(1) (2005). By its terms, the Act establishes that an employee injured in the course of employment has a right to receive workers' compensation benefits. Thus, if an employee's attempts to claim workers' compensation fall within one of the recognized categories of public policy, it must be because it is "the exercise of a legal right or privilege."

¶ 9 Nevertheless, the fact that an employee can point to a legal right or privilege does not automatically mean that the employee has established a clear and substantial public policy for purposes of the exception to the at-will rule. We have recognized that the "exercise of a legal right or privilege" category "poses analytical challenges different from, and generally greater than, [the other categories of the public policy exception]." *Hansen*, 2004 UT 62, ¶ 10, 96 P.3d 950. With regard to the other categories, we have explained that "[a]n employer owes a duty to an employee ... not to exploit the employment relationship by demanding that an employee choose between continued employment and violating a law or failing to perform a public obligation of clear and substantial

import." *Id.* This is because an employer's use of termination to "coerce an employee to commit unlawful acts or avoid public obligations serves no legitimate economic objective and corrodes civil society." *Id.* In contrast, an employer's attempts to dissuade or prevent an employee from exercising a legal right may not always lack a legitimate objective. Rather, when the "exercise of a legal right" category is implicated, both the employer and the employee may be able to invoke public policy "in aid of their cause." *Id.* ¶ 11. This was the case in *Hansen*, where the employer terminated three employees for possessing firearms on business premises in violation of company policy. *Id.* ¶¶ 1–5. The employees argued that their termination contravened public policy because they had a constitutional "right to keep and bear arms," *id.* ¶¶ 13–14, while the employer invoked its right to maintain a safe workplace, *see id.* ¶ 14 & n. 6. Recognizing that both the employer and the employee could support their positions with public policy, this court stated:

> The analysis of whether the public policy exception applies to a particular legal right or privilege will frequently require a balancing of competing legitimate interests: the interests of the employer to regulate the workplace environment to promote productivity, security, and similar lawful business objectives, and the interests of the employees to maximize access to their statutory and constitutional rights within the workplace.

*Id.* ¶ 11.

¶ 10 Thus, under *Hansen*, we must determine whether an employee's exercise of his or her workers' compensation rights invokes a clear and substantial public policy that outweighs the employer's interests in "regulat[ing] the workplace environment to promote productivity, security, and similar lawful business objectives." *Id.*

### A. Workers' Compensation Is a Clear and Substantial Public Policy

¶ 11 In order to conduct the balancing required by *Hansen*, we first determine whether the exercise of workers' compensation rights amounts to a public policy that is

both clear and substantial. We make determinations of "clear and substantial" public policy under the at-will rule on a case-by-case basis. Indeed, we have stated that

> determining what employee conduct implicates or furthers a clear and substantial public policy is a still-developing inquiry. Although we have established certain conduct that will almost always implicate a clear and substantial public policy ... there are other situations that we will have to address as they come before us.

*Ryan,* 972 P.2d at 408. When making determinations of public policy for purposes of the exception to the at-will rule, we "will construe public policies narrowly[,] ... applying only those principles which are so substantial and fundamental that there can be virtually no question as to their importance for promotion of the public good." *Berube v. Fashion Ctr., Ltd.,* 771 P.2d 1033, 1043 (Utah 1989). This is much narrower "than what may typically be characterized as 'public policy.'" *Ryan,* 972 P.2d at 405 (defining public policy as "'community common sense and common conscience' and 'general and well-settled public opinion relating to [people's] plain, palpable duty to [others].'" (alterations in original) (quoting *Black's Law Dictionary,* 1231 (6th ed.1990))).

¶ 12 We begin our discussion of the status of workers' compensation under the public policy exception by addressing whether the exercise of workers' compensation rights furthers a clear public policy. We conclude that it does. "A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions." *Ryan,* 972 P.2d at 405. In this case, the Utah Legislature has declared that "[a]n employee ... who is injured ... by accident arising out of and in the course of the employee's employment" is entitled to compensation pursuant to the provisions of the Act. Utah Code Ann. § 34A–2–401(1); *see also id.* § 34A–2–105(1). An employee's right to compensation for injuries sustained in the course of employment arises "irrespective of negligence on the part of employers or employees." *Sheppick v. Albertson's, Inc.,* 922 P.2d 769, 773 (Utah 1996). In accordance with the Act's requirement that an employee injured in the course of employment has the right to compensation, the Act requires an employer to "secure the payment of workers' compensation benefits for its employees," Utah Code Ann. § 34A–2–201 (2005), and imposes criminal penalties on employers who fail to comply, *id.* § 34A–2–209 (2005). We think that by adopting the Act and imposing penalties on an employer for noncompliance, the legislature plainly established the public policy that an employee injured in the scope of employment has the right to receive compensation.

¶ 13 However, it is not enough that a public policy be clear; it must also be substantial. To determine whether a public policy is substantial, we conduct a two-step inquiry. First, we ask "whether the policy in question is one of overarching importance to the public as opposed to the parties only." *Retherford v. AT & T Commc'ns of the Mountain States, Inc.,* 844 P.2d 949, 966 (Utah 1992). A policy that affects a duty that inures solely to the benefit of the employer and employee is generally insufficient to give rise to a substantial and important public policy. *Ryan,* 972 P.2d at 405. Second, we ask "whether the public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach of contract, thereby constituting a bar to discharge that parties cannot modify, even when freely willing and of equal bargaining power." *Retherford,* 844 P.2d at 966.

¶ 14 We conclude that workers' compensation is a policy of "overarching importance to the public, as opposed to the parties only." *Id.* at 966. This court has previously discussed the policy underlying workers' compensation. "The Workers' Compensation Act was enacted to provide economic protection for employees who sustain injuries arising out of their employment, therefore alleviating hardship upon workers and their families." *Drake v. Indus. Comm'n,* 939 P.2d 177, 182 (Utah 1997) (internal quotation marks omitted). Accordingly, we have stated that we will liberally construe the Act in favor of employee compensation. *Olsen v. Samuel McIntyre Inv. Co.,* 956 P.2d 257, 260 (Utah 1998). While workers' compensation provides economic support for injured workers and

their families, it was not enacted solely for their benefit. Rather, workers' compensation was designed to "provide speedy compensation" to injured workers, *Sheppick*, 922 P.2d at 773, thereby "reliev[ing] *society* of the care and support of the unfortunate victims of industrial accidents." *Retenna v. Indus. Comm'n*, 55 Utah 258, 185 P. 535, 537 (1919) (emphasis added). Indeed, this court has stated, " 'The theory of workmen's compensation is based largely upon the doctrine that society itself is vitally concerned in the prompt payment of compensation to injured and the dependents of killed employs [sic]. *It is a matter relating to the promotion of the general welfare.*' " *Id.* (emphasis added) (quoting *Rosen Steel v. Niles Forge & Mfg. Co.*, 7 Neg. & Comp. Cases Ann. 798).

¶ 15 The text of the Act lends further support to the proposition that workers' compensation is not just a private benefit affecting only the interests of the employer and the employee. For example, the Act provides a means by which an injured employee can obtain compensation even where his or her employer fails to comply with the Act's requirements. Utah Code Ann. § 34A–2–208(1) (2005). To this end, the Act creates the Uninsured Employers' Fund to "assist[ ] in the payments of workers' compensation benefits to any person entitled to the benefits, if: . . . that person's employer . . . does not have sufficient funds . . . to cover workers' compensation liabilities." *Id.* § 34A–2–704(1) (2005). Moreover, an employer who fails to provide sufficient workers' compensation insurance "is guilty of a class B misdemeanor." *Id.* § 34A–2–209(1)(a)(I). Similarly, it is a criminal misdemeanor for an employer to "deduct[ ] any portion of the [workers' compensation insurance] premium from the wages or salary of any employee entitled to the benefits of [the Act]." *Id.* § 34A–2–108(3) (2005).

¶ 16 Workers' compensation not only is a "question . . . of . . . importance to the public," but also furthers a "public interest [that] is so strong . . . that we should place the policy beyond the reach of contract." *Retherford*, 844 P.2d at 966. Evidence of this lies within the text of the Act itself. Section 34A–2–108(1) declares that "an agreement by an employee to waive the employee's rights to compensation . . . is not valid."[1] Similarly, that section provides that an employee's agreement "to pay any portion of the [insurance] premium paid by his employer is not valid." *Id.* § 34A–2–108(2). Thus, by statute, an employer cannot relieve itself of its obligation to provide workers' compensation by asking employees to contract away their rights. The legislature itself has placed workers' compensation "beyond the reach of contract." It follows that an employer should not be able to free itself of its workers' compensation obligations by discharging employees entitled to workers' compensation benefits. Accordingly, we hold that workers' compensation constitutes public policy that is both clear and substantial.

### B. The Clear and Substantial Public Policy Underlying Workers' Compensation Outweighs La–Z–Boy's Interests

¶ 17 Having concluded that workers' compensation represents a clear and substantial public policy, we now must weigh that policy against La–Z–Boy's interests. In this case, La–Z–Boy has invoked the policy that underlies at-will employment—that employers ought to be able "to manage their workforces" and regulate their workplace environments "to promote productivity, security, and similar lawful business objectives." However, an employer's ability to regulate its workforce primarily inures to the benefit of the employer and the employee, not to the public in general. Moreover, while there may be public policies underlying an employer's general ability to manage its employees free

---

1. We note that section 34A–2–108 does provide for the settlement of workers' compensation claims in accordance with Utah Code section 34A–2–420. Section 34A–2–420(4) permits the parties to agree to a "settlement of *disputed* medical, disability, or death benefit entitlements" or the "commutation and settlement of reasonable future medical, disability, or death benefit entitlements." *Id.* 34A–2–420(4) (2005) (emphasis added). An administrative law judge must "review and . . . approve" these agreements. Utah Code Ann. § 34A–2–420(4). Thus, this section does not alter our conclusion that the Act does not allow an employee to contract away his or her workers' compensation rights.

from judicial interference, we can think of no public policy that would be furthered by permitting employers to discharge employees who seek to exercise their workers' compensation rights.

¶ 18 In contrast to La–Z–Boy's stated interests, La–Z–Boy's employees raise a public policy that provides a benefit outside of the private employer-employee relationship. By design, workers' compensation benefits the public as a whole. *See supra* ¶ 14. It follows, then, that limiting an employer's ability to interfere with workers' compensation serves the greater good. We therefore conclude that in order to give effect to the legislature's pronouncement that workers' compensation is in the public's interest, an employer's right to workplace autonomy must yield.[2] Accordingly, "an employer owes its employees a duty "not to exploit the employment relationship" by forcing employees to choose between their jobs and compensation under the Act. *See Hansen,* 2004 UT 62, ¶ 10, 96 P.3d 950.

¶ 19 We therefore hold that an employee's exercise of workers' compensation rights constitutes the "exercise of a legal right" that embodies a clear and substantial public policy. An employer who terminates an employee in retaliation for the employee's exercise of that right has violated a clear and substantial public policy and may be sued for wrongful discharge by the discharged employee.

*C. The Act Does Not Preempt Our Holding that Employees Terminated for Exercising Their Workers' Compensation Rights Have a Wrongful Discharge Cause of Action*

¶ 20 La–Z–Boy has argued that the Act prohibits this court from using workers' compensation as the basis of a wrongful discharge cause of action because (1) the Act does not include a retaliation provision, and (2) the Act provides employees with their "exclusive remedy" against their employer.

¶ 21 La–Z–Boy notes, correctly, that the Act does not contain a provision that forbids an employer to discharge an employee in retaliation for claiming workers' compensation. According to La–Z–Boy, this court should not allow an employee who has been the subject of a retaliatory termination to bring a wrongful discharge cause of action in the absence of an anti-retaliation provision. To lend support to its argument, La–Z–Boy points to this court's general reluctance to construe a statute to include a private cause of action where the statute does not specifically provide one. It is true that Utah courts are reluctant to imply a private statutory cause of action in the absence of express statutory language. *Buckner v. Kennard,* 2004 UT 78, ¶ 40, 99 P.3d 842. In this case, however, we are not determining whether the Act includes a private statutory cause of action. Rather, we are applying our common law wrongful discharge cause of action to retaliatory termination for the exercise of rights guaranteed by the Act. Because wrongful discharge is a common law claim, this determination is entirely within our province. The lack of an anti-retaliation provision in the Act does not affect this court's ability to recognize this state's public policy for purposes of a wrongful discharge cause of action.

¶ 22 Moreover, the absence of an anti-retaliation provision does not diminish the Act's function as a source of clear and substantial public policy. There would be no more effective means of undermining the purposes behind the Act than allowing an employer to terminate an employee in retaliation for filing workers' compensation claims. *See Frampton v. Cent. Ind. Gas Co.,* 260 Ind. 249, 297 N.E.2d 425, 427 (1973). As the Indiana Supreme Court stated,

---

2. This conclusion does not mark the first time an employer's interest in workplace autonomy has been outweighed by public interests. For example, an employer is not free to maintain an unsafe working environment, 29 U.S.C. § 654 (2000) (requiring employers to provide safe workplace environments in compliance with the federal Occupational Safety and Health Act), to compensate employees below the minimum wage, Utah Code Ann. §§ 34–40–101 to –106 (2005) (requiring employers to pay the minimum wage), or to make employment decisions, such as hiring or firing, based on race, national origin, sex, religion, pregnancy, or disability, Utah Code Ann. § 34A–5–106 (2005) (prohibiting employers from making discriminatory employment decisions).

The [Workers' Compensation Act] creates a *duty* in the employer to compensate employees for work-related injuries (through insurance) and a *right* in the employee to receive such compensation. But in order for the goals of the Act to be realized and for public policy to be effectuated, the employee must be able to exercise his right in an unfettered fashion without being subject to reprisal. If employers are permitted to penalize employees for filing workmen's compensation claims, a most important public policy will be undermined. The fear of being discharged would have a deleterious effect on the exercise of a statutory right. Employees will not file claims for justly deserved compensation—opting, instead to continue their employment without incident. The end result, of course, is that the employer is effectively relieved of his obligation.

*Id.* (construing a provision in the Indiana workers' compensation statute that prohibited an employer's use of any "device" to relieve the employer of his workers' compensation obligations). In other words, the recognition of a retaliatory discharge cause of action for seeking workers' compensation benefits is essential to maintaining an employee's rights under the Act.

¶ 23 Other courts have also concluded that workers' compensation implicates a clear public policy for wrongful discharge purposes despite the lack of a statutory prohibition against retaliation. For example, in *Hansen v. Harrah's*, 100 Nev. 60, 675 P.2d 394, 395 (1984), two casino workers brought wrongful discharge suits alleging they were terminated for filing workers' compensation claims. The Nevada Supreme Court held that the "failure of the legislature to enact a statute expressly forbidding retaliatory discharge for filing workmen's compensation claims [did] not preclude [the court] from providing a remedy for what [it] conclude[d] to be tortious behavior." *Id.* at 396. In so holding, the court reasoned that "Nevada's workmen's compensation laws reflect a clear public policy favoring economic security for employees injured while in the course of their employment." *Id.* Furthermore, the court realized that "[f]ailure to recognize the cause of action of retaliatory discharge for

filing a workmen's compensation claim would only undermine [the Nevada Workmen's Compensation Act] and the strong public policy behind its enactment." *Id.* Other states have used similar reasoning to adopt a public policy exception to the at-will rule to make discharge in retaliation for filing workers' compensation claims an actionable tort. *See Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367, 1373 (Colo.Ct.App.1989) (concluding that "since an employee is granted the specific right to apply for and receive compensation under the [Workers' Compensation Act], an employer's retaliation against such an employee for his exercise of such right violates Colorado's public policy ... [that] provides the basis for a common law claim by the employee to recover damages sustained ... as a result"); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, 358–61 (1978) (recognizing that the Illinois Legislature did not intend to make injured employees choose between compensation and their jobs and thus holding that the plaintiff had a retaliatory discharge cause of action, despite the lack of a legislative anti-retaliation pronouncement at the time of discharge); *Murphy v. City of Topeka–Shawnee County Dep't of Labor Servs.*, 6 Kan.App.2d 488, 630 P.2d 186, 192–93 (1981) (holding that the plaintiff alleged a valid cause of action for retaliatory discharge where he was terminated for claiming workers' compensation rights, despite the lack of a retaliation provision in Act, because allowing an employer "to coerce employees in the free exercise of their rights under the act would substantially subvert the purpose of the act"); *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 732–34 (Ky.1983) (recognizing a cause of action for discharge in retaliation for filing workers' compensation claims even though, at the time, the Kentucky Workers' Compensation Act did not contain a retaliation provision); *Jackson v. Morris Commc'ns Corp.*, 265 Neb. 423, 657 N.W.2d 634, 640–41 (2003) (recognizing that the Nebraska Workers' Compensation Act "was promulgated to serve an important public purpose" that would be undermined if employees fear retaliation, and thus recognizing a public policy exception to the at-will rule for retaliatory

discharge due to the exercise of workers' compensation rights even though the statute did not contain an anti-retaliation provision); *Shick v. Shirey*, 552 Pa. 590, 716 A.2d 1231, 1237 (1998) (holding that the "termination of an at-will employee for filing a workers' compensation claim violates public policy" despite the lack of a retaliation provision in the statute).

■ ¶ 24 We also hold that the exclusivity provision of the Act does not bar an employee's wrongful discharge cause of action. Under the Act, "[t]he right to recover compensation ... for injuries sustained by an employee ... shall be the exclusive remedy against the employer." Utah Code Ann. § 34A–2–105. However, "[i]t is well settled that the Act covers only mental and physical injuries sustained on the job." *Shattuck–Owen v. Snowbird Corp.*, 2000 UT 94, ¶ 19, 16 P.3d 555. Accordingly, the exclusivity provision only "bars common-law tort actions requiring proof of physical or mental injury." *Id.* In this case, the employees' wrongful discharge cause of action does not arise out of work-related physical or mental injuries. Therefore, the exclusivity provision does not hinder an employee's wrongful discharge cause of action brought against an employer who has discharged an employee in retaliation for the employee's exercise of rights.

¶ 25 Having concluded that an employee who has been terminated for exercising his or her workers' compensation rights has a wrongful discharge cause of action under the public policy exception to the at-will rule, we turn to the federal court's remaining questions of whether this cause of action extends to constructive discharge, to workplace discrimination or harassment, or to the termination of an employee who has not actually sought compensation but who has opposed his or her employer's treatment of injured employees.

## II. THE WRONGFUL DISCHARGE CAUSE OF ACTION EXTENDS TO CONSTRUCTIVE DISCHARGE

¶ 26 This court has not had the opportunity to address whether an employee who has been constructively discharged has a wrongful discharge cause of action. However, the

Utah Court of Appeals has addressed this question. In *Sheikh v. Department of Public Safety*, the court of appeals held that "an employee who believes that he or she has been constructively discharged may bring an action for discrimination [based on pregnancy] because 'an involuntary or coerced resignation is equivalent to a discharge.'" 904 P.2d 1103, 1107 (Utah Ct.App.1995) (quoting *Bulaich v. AT & T Info. Sys.*, 113 Wash.2d 254, 778 P.2d 1031, 1033 (1989) (internal quotation marks omitted)). In so holding, the court of appeals defined constructive discharge as resignation under "working conditions that a reasonable person would view as intolerable." *Id.* Like the court of appeals, other jurisdictions have recognized that a constructive discharge is the same as an actual discharge. *See, e.g., Breitsprecher v. Stevens Graphics, Inc.*, 772 So.2d 1125, 1130 (Ala.2000) (recognizing that an employee who was constructively discharged for claiming workers' compensation benefits had a wrongful discharge cause of action against her former employer); *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380, 385 (1988) (upholding a wrongful discharge jury instruction based on substantial evidence of constructive discharge); *Casenas v. Fujisawa USA, Inc.*, 58 Cal.App.4th 101, 67 Cal. Rptr.2d 827, 835 (1997) ("[A] constructive discharge is legally regarded as a firing rather than a resignation."); *Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367, 1372–73 (Colo. Ct.App.1989) (holding that an employee who claimed that he had been constructively discharged for filing a workers' compensation claim had stated a proper wrongful discharge claim); *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 653 N.E.2d 161, 168 (1995) (recognizing that "constructive discharge is legally regarded as a firing rather than a resignation").

■ ¶ 27 We agree with the Utah Court of Appeals and hold that a resignation under working conditions that a reasonable employee would consider intolerable is equivalent to a termination. Thus, an employee's cause of action for wrongful discharge as a result of the exercise of workers' compensation rights extends to constructive discharge. Holding otherwise would make it possible for

employers both to escape their obligations to provide compensation by retaliating against injured employees with intolerable working conditions and to avoid a wrongful discharge cause of action by never actually terminating the employee. Just as allowing an employer to terminate an injured employee seeking compensation undermines the purpose of the Act, so too does allowing an employer to make conditions so intolerable that an employee has no choice but to resign. Therefore, we believe that recognizing constructive discharge as actual termination is necessary to give effect to the purposes of the Act.

## III. THE WRONGFUL DISCHARGE CAUSE OF ACTION DOES NOT EXTEND TO RETALIATORY HARASSMENT OR DISCRIMINATION

¶ 28 Having concluded that the public policy exception applies to both actual and constructive discharge, we now address the district court's question regarding whether the wrongful discharge cause of action extends to retaliatory harassment or discrimination. To answer this question, we look to the elements of wrongful discharge. "To make out a prima facie case of wrongful discharge, an employee must show (I) that his employer *terminated* him; (ii) that a clear and substantial public policy existed; (iii) that the employee's conduct brought the policy into play; and (iv) that the discharge and the conduct bringing the policy into play are causally connected." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 404 (Utah 1998) (emphasis added) (footnotes omitted). When an employee alleges only retaliatory harassment or discrimination, that employee has failed to satisfy the first element and the wrongful discharge tort does not apply.

¶ 29 Moreover, we decline the invitation to create a new cause of action for retaliatory harassment or discrimination. While retaliatory discrimination or harassment is deplorable, it does. not implicate a clear and substantial public policy to the same extent as a discharge. When an employee is discharged in retaliation for pursuing a workers' compensation claim, that employee is placed in the untenable position of choosing between receiving compensation or maintaining em-

ployment. Because most employees would choose to retain their jobs, this would in turn relieve employers of their obligations under the Act. *See Frampton v. Cent. Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425, 427 (1973) (recognizing that when employees are forced to choose between their job and compensation, they will generally choose their job, the end result of which relieves the employer of his workers' compensation obligation). We do not think this policy applies to the same extent when the employee suffers unpleasantness, not amounting to constructive discharge, and does not have the fear of losing his or her employment.

¶ 30 In addition, we are concerned that creating a new cause of action for harassment would expand the public policy exception to the at-will rule beyond its intended narrow scope and encourage myriad claims against employers. The concept of discharge is fairly concrete—either the employer actually terminated the employee or the employee resigned under circumstances so unbearable that no reasonable employee could tolerate them. However, discrimination and harassment have the potential to implicate a much broader range of behavior, including demotions, salary reductions, job transfers, or disciplinary actions. *See Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill.2d 29, 206 Ill.Dec. 625, 645 N.E.2d 877, 882 (1994) (stating the adoption of a cause of action short of termination would "replace the well-developed element of discharge with a new, ill-defined, and potentially all-encompassing concept of retaliatory conduct or discrimination"). If employees were allowed to bring a cause of action for retaliatory discrimination, we fear the courts "would be called upon to become increasingly involved in the resolution of workplace disputes which center on employer conduct that heretofore has not been actionable at common law." *Id.* We therefore decline to extend the public policy exception to the at-will rule to encompass retaliatory discrimination. *See Mintz v. Bell Atl. Sys. Leasing Int'l*, 183 Ariz. 550, 905 P.2d 559, 562 (App.1995) (refusing to recognize a cause of action for "wrongful failure-to-promote" where an employee claimed she had not been promoted due to retaliation against her for filing a sex discrimination

claim); *Zimmerman,* 206 Ill.Dec. 625, 645 N.E.2d at 882 (refusing to "extrapolate . . . a cause of action predicated on retaliatory demotion" from a wrongful discharge tort); *Below v. Skarr,* 569 N.W.2d 510, 512 (Iowa 1997) (holding that "claimed harassment of a worker, including threatened termination, does not give rise to a claim at common law").

¶ 31 Much as we might lament the suffering of an employee who has been harassed for exercising his or her statutory rights, it is not our prerogative to remedy the situation in the absence of a clear and substantial public policy. Employees under these circumstances should look to the legislature to define their recourse against employers who discriminate against them in retaliation for claiming the compensation to which they are entitled. Indeed, many states have enacted such legislation. *See, e.g.,* Conn. Gen.Stat. § 31–290a (2005) (prohibiting the discharge of or discrimination against an employee who has exercised workers' compensation rights and granting employees a private cause of action against employers who violate the statute); Mo.Rev.Stat. § 287.780 (2000) (same); N.C. Gen.Stat. § 95–241 (2005) (prohibiting retaliatory discrimination against employees who have filed workers' compensation claims). Until our legislature joins these states, employees who have suffered retaliatory discrimination as a result of claiming workers' compensation benefits do not have a cause of action against their employers.

## IV. THE WRONGFUL DISCHARGE CAUSE OF ACTION DOES NOT EXTEND TO AN EMPLOYEE WHO OPPOSES HER EMPLOYER'S TREATMENT OF OTHER EMPLOYEES WHO ARE ENTITLED TO WORKERS' COMPENSATION BENEFITS

¶ 32 The final question the federal court has asked us to address is whether an employee who opposes her employer's treatment of injured employees has a wrongful discharge cause of action under the public policy exception to the at-will rule. To fully respond to this inquiry, however, we must recite the relevant facts.[3]

¶ 33 La–Z–Boy hired Marilyn Touchard to serve as an "environmental/assistant safety manager." Her job responsibilities included investigating the cause of La–Z–Boy's high workers' compensation costs. After conducting her investigation, Ms. Touchard wrote La–Z–Boy a memorandum concluding that the company had a high injury rate and that employees were "waiting for extensive periods of time to receive treatment, diagnostic testing, and/or resolution of their claims, due to the intentional mismanagement of their claims." Ms. Touchard also informed La–Z–Boy that its claims adjuster was "hostile" toward employees who filed workers' compensation claims and "documented that [the claims adjuster] attempted to deny benefits to . . . an employee with a documented work-related injury and extensive work history with the company."

¶ 34 In addition to her job investigating La–Z–Boy's workers' compensation costs, Ms. Touchard was the head of the ergonomics team. In this capacity, Ms. Touchard conducted a study and submitted a memorandum concluding that the practices employed on the upholstery production line could cause shoulder injuries.

¶ 35 The allegations of the complaint are that after submitting the memorandum detailing the problems in La–Z–Boy's production line, Ms. Touchard met with Mr. Smith, the Human Resources Director, and informed him of her belief that the "alternate duty assignments" given to injured employees were demeaning. Moreover, she informed him that employees were deciding not to report injuries to avoid being harassed by management. She alleges that, as a result of her complaint, Mr. Smith began criticizing her, recommending that she be "written up," and delaying the implementation of programs she had recommended.

---

**3.** The facts we recite here are those alleged by the employees in their complaint before the federal court and in their brief before this court. We need only look to the facts as alleged to determine whether the plaintiffs have pled a valid cause of action under Utah law. We do not, however, comment upon the veracity of the plaintiffs' allegations.

¶ 36 Several months after meeting with Mr. Smith, Ms. Touchard met with Mr. Garren, La–Z–Boy's vice president. At this time, Mr. Garren "*falsely* accused Ms. Touchard of coaching employees on how they could sue La–Z–Boy and told her that she could not tell employees they had a legal right to contact Utah's Labor Commission (emphasis added)." A few months after this incident, Ms. Touchard voiced her objections to the proposed adoption of a "120–day return to work rule." She alleges that at this time Mr. Garren "got angry with [her] and told her she was never to discuss employees' rights with the employees."

¶ 37 The final incident alleged by Ms. Touchard is that she reported to Mr. Garren that an employee had been injured and that his benefits were being improperly denied. At this time, she was allegedly told "that she would be fired if she ever talked to any employees about their Workers' Compensation issues or their injuries." Several months after this final meeting, Ms. Touchard took maternity leave, during which she was informed she had been terminated and her position had been filled. Ms. Touchard's complaint alleges that La–Z–Boy terminated her "because she opposed its practices of abusing employees who applied for [workers' compensation benefits] and maintaining an unsafe workplace." The employees' brief asserts that Ms. Touchard was fired for "inform[ing] injured workers of their rights to workers' compensation." While the complaint does allege that Ms. Touchard was warned not to discuss workers' compensation claims with La–Z–Boy employees and was accused of "coaching employees on how they could sue La–Z–Boy," an accusation her brief claims was false, she has not pled that she actually discussed workers' compensation benefits with La–Z–Boy employees or assisted them in pursuing claims.

¶ 38 We hold that Ms. Touchard's opposition to her employer's workers' compensation practices does not implicate a clear and substantial public policy of this state. This is not the first time this court has addressed whether an employee terminated for reporting to her employer potential policy or criminal violations has a cause of action under the public policy exception to the at-will rule. In *Heslop v. Bank of Utah,* 839 P.2d 828 (Utah 1992), we were asked whether Mr. Heslop, a senior vice president and manager of the bank's Salt Lake Division, had a cause of action for wrongful discharge. *Id.* at 831. Specifically, Mr. Heslop alleged that he had been terminated for reporting to a bank officer and the bank president that the bank had misstated its income and assets, thereby creating a deficiency between the bank's stated capital and its actual capital. *Id.* While Mr. Heslop eventually reported the deficiency to federal and state bank regulators, *id.* at 832, this court recognized that Mr. Heslop's reporting furthered a substantial public policy because he "pursued all internal methods for resolving the problem." *Id.* at 838. This court did not require him to go "outside the Bank to try to correct the policy violation." *Id.* at 838.

¶ 39 Several years later, we returned to the reporting question in *Fox v. MCI Communications Corp.,* 931 P.2d 857 (Utah 1997). In *Fox,* a sales representative reported to her employer that her coworkers were "making existing customer accounts appear new on the corporate records so that they could meet sales quotas and earn higher commissions." *Id.* at 858–59. She was terminated shortly after reporting her coworkers' practices. *Id.* The employee claimed she had been terminated in violation of public policy because her internal reporting furthered the public policy found in the sections of the Utah Code that criminalized computer-assisted fraud, Utah Code Ann. § 76–6–703 (1995), and "acts of fraud or embezzlement," Utah Code Ann. §§ 76–6–403, 405 (1995), as well as a statute regulating corporate responsibility, Utah Code Ann. § 76–2–204 (1995). *Fox,* 931 P.2d at 859. This court disagreed. *Id.* at 861. While we recognized that the criminal code implicated a clear and substantial public policy, *id.* at 860, we held that "if an employee reports a criminal violation to an employer, rather than to public authorities, and is fired for making such reports, that does not, in our view, contravene a clear and substantial public policy." *Id.* In so holding, we explained that "[a]lthough employees may have a duty to disclose information concerning the employer's business to their employ-

er, that duty ordinarily serves the private interest of the employer, not the public interest." *Id.* at 861.

¶ 40 Despite its holding, *Fox* did not eliminate a cause of action for internal reporting in all cases. We recognized as much in *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 408 n. 7 (Utah 1998). While internal reporting was not at issue in *Ryan*, we discussed both *Heslop* and *Fox* in a footnote to illustrate that "determining what employee conduct . . . furthers a clear and substantial public policy is a still-developing inquiry." *Id.* at 408 & n. 7. The footnote suggests that *Fox* held only that internal reporting does not automatically further a clear and substantial public policy. *See id.* at 408 n. 7. Specifically, we stated, "Although *Heslop* suggests that any internal reporting will support a wrongful discharge claim, we emphasize that only internal reporting that furthers a clear and substantial public policy will satisfy the third element of a wrongful discharge claim." *Id.* We now endorse this conclusion anew and hold that internal reporting can give rise to a wrongful discharge cause of action where it furthers a clear and substantial public policy.

¶ 41 Thus, the inquiry in this case is whether Ms. Touchard's complaints to La–Z–Boy management about La–Z–Boy's workers' compensation and ergonomic practices furthered a clear and substantial public policy. As we have previously stated, we " 'narrowly construe the public policies' which might be used to support a public policy claim." *Ryan*, 972 P.2d at 405 (quoting *Peterson v. Browning*, 832 P.2d 1280, 1282 (Utah 1992)). Although we rely on the Workers' Compensation Act to conclude that an employee who is terminated for exercising his or her workers' compensation rights has a wrongful discharge cause of action, it does not follow that all employee complaints relating to workers' compensation also further the same clear and substantial public policy.

¶ 42 We first discuss Ms. Touchard's objections to the menial tasks being assigned to injured employees. Reporting employee harassment in retaliation for the employees' exercise of workers' compensation rights does not further a clear and substantial public policy. The assignment of demeaning job responsibilities in retaliation for the exercise of workers' compensation rights constitutes harassment. As we discussed in the previous section, an employee who has claimed that he or she was harassed for filing a workers' compensation claim does not have a cause of action under our wrongful discharge tort or under the Act. Because the La–Z–Boy employees who have been assigned demeaning tasks do not have a cause of action, it follows that Ms. Touchard also does not have a cause of action for complaining about the way in which the employees were being treated.

¶ 43 Likewise, Ms. Touchard's complaints about La–Z–Boy's management of claims did not further a clear and substantial public policy. Ms. Touchard told La–Z–Boy that she believed claims were being "intentionally mismanaged," that La–Z–Boy's claims adjuster had a hostile attitude toward injured employees who sought workers' compensation benefits, and that the claims adjuster had, in the past, attempted to deny a claim to an employee with a documented injury. Ms. Touchard reported her findings as a result of an investigation, which she was hired to conduct, regarding La–Z–Boy's workers' compensation costs.. Thus, it appears she conducted her study and reported her findings to further her employer's interests, to wit: to determine the cause of high workers' compensation costs. However, even if her reported findings furthered a public interest, we do not think it was sufficiently clear and substantial. Reporting the attempted denial of a past claim, however valid, does little to prevent an employer from avoiding its current or future obligations under the Act. Further, we think we would be construing public policy too broadly if we were to hold that an employee's complaint about a hostile claims adjuster or mismanagement of claims further a clear and substantial public policy. We fear that such a construction would render any complaint about an employer's workers' compensation practices actionable.

¶ 44 Moreover, Ms. Touchard's objections to the production line and the proposed 120–day rule did not invoke the actual policies furthered by the Workers' Compensation Act. For example, her claim that the production line had the potential to cause shoulder

injuries did not directly implicate her employer's obligation to compensate employees for injuries incurred in the scope of employment; rather, it appears that Ms. Touchard's report regarding the ergonomics of the production line furthered the private interests of La–Z–Boy and its employees. Indeed, one reason to have an ergonomics team is to minimize employee injuries, thereby preventing a decrease in work productivity and an increase in workers' compensation claims. Likewise, while Ms. Touchard was opposed to the 120–day return-to-work rule, there is no indication that an employer may not implement such a rule under the Act. Ms. Touchard has not provided us with any evidence suggesting that her opposition to this rule furthered a clear and substantial public policy.

¶ 45 We note that Ms. Touchard's complaints about La–Z–Boy policies were all made in furtherance of her job duties. La–Z–Boy hired her to conduct investigations regarding both workers' compensation and ergonomics. Ms. Touchard did so, and as part of these duties, reported her concerns and recommendations to La–Z–Boy. Employers are free to create internal monitoring or investigation positions. While the public may benefit when an employer chooses to create such a position, the creation of an investigatory or supervisory position is likely designed to serve the employer's private interests by minimizing its risk of liability. *See Robinson v. Wal–Mart Stores, Inc.*, 341 F.Supp.2d 759, 763 (W.D.Mich.2004) (noting that an employee's complaints to the employer were made with "an eye toward correcting [improprieties in employer's wage and work hour reporting practices] and minimizing [the employer's] risk of liability"). Just as employers are free to create such positions, they likewise are free to disagree with the findings made by such employees and terminate employees who make findings with which the employer does not agree.

¶ 46 Finally, we hold that Ms. Touchard's allegation that she challenged La–Z–Boy's purported unfair treatment of an employee's claim also did not further a clear and substantial public policy. In this case, there is no evidence that Ms. Touchard was responsible for processing or overseeing claims or that she had any personal knowledge regarding the employee's claim. The public policy exception would be expanded beyond its intended narrow scope if we were to hold that an employee with no authority over or personal knowledge of an individual workers' compensation claim has a cause of action for expressing her beliefs about the propriety of the employer's treatment of that claim. We fear that if we were to so hold, employers could be held hostage by employees who complain about matters of which they had no personal knowledge.

¶ 47 We commend Ms. Touchard's willingness to express her objections to her employer's practices that she believed were unfair, but her complaints cannot be viewed to further a clear and substantial public policy. We therefore hold that Ms. Touchard does not have a wrongful discharge cause of action for complaining about La–Z–Boy's treatment of injured employees.[4]

---

4. We note that our holding is limited to the question certified to us—whether an employee who *opposes* an employer's treatment of employees who are entitled to workers' compensation has a wrongful discharge cause of action. Our opinion in this case does not address whether a wrongful discharge cause of action exists for an employee who goes beyond opposing employer practices and actually assists injured employees to file workers' compensation claims. *Cf. McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir.1996) (holding that a personnel manager who was terminated for reporting violations of the federal Fair Labor Standards Act did not allege a cause of action under that Act's anti-retaliation provision because she reported the violations within the scope of her employment, but recognizing that she would have had a cause of action under the anti-retaliation provision if she had "actively assist[ed] other employees in asserting their FLSA rights"). While the briefs in this case address whether a coworker's assistance furthers a clear and substantial public policy, that is not the question certified to us by the federal court, nor has Ms. Touchard alleged, either before us or in her complaint before the federal court, that she ever actually assisted an employee in filing a workers' compensation claim. Moreover, our opinion today does not address whether a wrongful discharge cause of action exists when an employer fires an employee who refused to follow the employer's order to interfere with an employee's workers' compensation claim, *see Wilkerson v. Standard Knitting Mills, Inc.*, 1989 WL 120298, *1, 2–3, 1989 Tenn. App. LEXIS 666, *1–3, 7–8 (Tenn.Ct.App.1989)

## CONCLUSION

¶ 48 Based on the foregoing, we hold that retaliatory discharge for filing workers' compensation violates this state's clear and substantial public policy as pronounced by the Workers' Compensation Act. Thus, an employee who has been terminated or constructively discharged from his or her job in retaliation for the exercise of workers' compensation rights has a wrongful discharge cause of action against his or her employer under the public policy exception to the at-will rule. However, we do not believe the same policy is implicated when an employee suffers retaliatory harassment or discrimination, or when an employer discharges an employee who opposes the employer's treatment of employees who are entitled to benefits.

¶ 49 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.

(granting a wrongful discharge cause of action to a company nurse who claimed she had been terminated for her refusal to participate in the employer's scheme to cut workers' compensation costs by not sending injured employees for outside medical treatment), or to an employee who refused to terminate an employee who has filed a workers' compensation claim, *see Lins v. Children's Discovery Ctrs. of Am., Inc.,* 95 Wash.App. 486, 976 P.2d 168, 172 (1999) (recognizing the policy of workers' compensation would be "jeopardized if, without incurring liability, an employer can fire an employee for refusing to carry out a clearly unlawful *order* " (emphasis added)).