2004 UT 62

**Luke HANSEN, Paul Carlson, and Jason Melling, Plaintiffs and Appellants,**

v.

**AMERICA ONLINE, INC., Sarah McElwee, Ric Waters, and John Does I–X, Defendants and Appellees.**

No. 20020288.

Supreme Court of Utah.

July 20, 2004.

James D. Vilos, Centerville, Robert B. Sykes, Salt Lake City, for plaintiffs.

Gregory W. Stevens, Salt Lake City, for defendants.

Janet H. Smith, Paul C. Burke, Salt Lake City, for amicus Utah Manufacturers Assoc.

Calvin. L. Rampton, Michael P. O'Brien, Marci B. Rechtenbach, Salt Lake City, for amicus Utah SHRM.

NEHRING, Justice:

¶ 1 Luke Hansen, Jason Melling, and Paul Carlson appeal the trial court's summary determination that the "public policy" exception to Utah's at-will employment doctrine did not apply to the circumstances surrounding the termination of their employment by America Online. We affirm.

## BACKGROUND

¶ 2 Messrs. Hansen, Melling and Carlson, whom for convenience we will refer to as "the employees," were employed by America Online ("AOL") at its call center in Ogden, Utah. The Ogden call center is located in a strip mall. AOL leased, and reserved for its exclusive use, up to 350 parking stalls from the strip mall's larger public parking lot.[1]

¶ 3 AOL's company policy prohibited employees at the Ogden Call Center from carrying or possessing a firearm of any type at the call center or in its exclusive parking lot.[2] Printed notice of the policy was displayed in the entrance lobby to the Ogden Call Center. The employees admitted that they each had seen this policy displayed and knew the terms of AOL's Workplace Violence Prevention Policy at the time they brought firearms onto the AOL parking lot.

¶ 4 On September 14, 2000, the three employees, all of whom were off-duty at the time, met in the lot where their cars were parked. Each had a firearm in his car, and they planned to go target shooting at a local gun range. An AOL security camera recorded Messrs. Melling and Carlson transferring their guns to Mr. Hansen's car in the parking lot. Four days later, AOL discharged the employees. Although each employee was an at-will employee and could be terminated without cause, AOL acknowledged that the men were discharged because they violated AOL's Workplace Violence Prevention Policy.[3]

¶ 5 The employees then filed a lawsuit alleging wrongful termination. They alleged that, the AOL Workplace Violence Prevention Policy notwithstanding, AOL was liable for their wrongful discharge because their possession of firearms on the AOL parking lot was protected by a clear and substantial public policy. Both the employees and AOL

---

1. AOL clearly marked this leased portion of the parking lot as its exclusive parking space. Employees of AOL were allowed to park in this leased lot as long as they displayed a company parking pass in their vehicles. AOL reserved the right to exclude others from parking in its leased space, although it did not always exercise this right.

2. At the time of the incident, the AOL company policy, known as the AOL Workplace Violence Prevention Policy, prohibited employees from bringing firearms to the AOL premises or parking lots. The printed notice stated:

> No weapons of any type are allowed in the America Online Ogden Call Center, or in the AOL parking lots, or while conducting AOL business.... This applies to concealed weapons also. Weapons include firearms of any kind.... These restrictions are pursuant to corporate policy, HR Policy 505—Workplace Violence Prevention, UCA 76–10–523.5 and other applicable law.

3. AOL contends in its brief that an e-mail sent by Mr. Hansen containing "hateful and violent ideas" contributed to the decision to terminate his employment.

filed motions for summary judgment. The trial court issued a memorandum decision denying the employees' motion and granting AOL's motion. The employees appeal. We affirm.

¶ 6 Whether the trial court properly granted summary judgment is a question of law that we review for correctness, granting no deference to the lower court's legal conclusions. *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 14, 52 P.3d 1179.

## ANALYSIS

¶ 7 Utah's employment law presumes that all employment relationships entered into for an indefinite period of time are at-will, where the employer or the employee may terminate the employment for any reason (or no reason) except where prohibited by law. *Rackley v. Fairview Care Ctrs., Inc.*, 2001 UT 32, ¶ 12, 23 P.3d 1022 (citing *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 400 (Utah 1998)) (further citations omitted). The presumption of validity given to an employer's decision to discharge an employee may be overcome by demonstrating that

> (1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of [some] agreed-upon condition; (2) a statute or regulation restricts the right of an employer to terminate an employee under certain conditions; or (3) the termination of employment constitutes a violation of a clear and substantial public policy.

*Fox v. MCI Communications Corp.*, 931 P.2d 857, 859 (Utah 1997) (citations omitted). An employee's discharge for a reason that contravenes a clear and substantial public policy gives rise to a cause of action in tort. *Peterson v. Browning*, 832 P.2d 1280, 1284 (Utah 1992).

¶ 8 The general rule that the employer-employee relationship is presumed to be at-will is fully integrated into our common law. *See Fox*, 931 P.2d at 859; *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 53–54 (Utah 1991);

*Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1044 (Utah 1989); *Bihlmaier v. Carson*, 603 P.2d 790, 792 (Utah 1979). By contrast, the public policy exception is a relatively recent offspring of the at-will doctrine. Remarking on the immature developmental state of our public policy exception jurisprudence, we have stated:

> While the term "clear and substantial" adds little by way of specific guidance, a more precise definition of the term must await the time when this Court has had sufficient experience with a number of cases so that we can deduce from our experience more precise standards that give specific content to the term "public policy."

*Fox*, 931 P.2d at 860.

¶ 9 Owing to the stability and predictability afforded employers and employees by the at-will rule, we have been justifiably wary of brushing broad public policy landscapes on the canvas of these cases, electing instead to limit the horizon of these cases by their facts. We have, however, outlined four categories of public policies eligible for consideration under the exception. These are:

> (i) refusing to commit an illegal or wrongful act, such as refusing to violate the antitrust laws; (ii) performing a public obligation, such as accepting jury duty; (iii) exercising a legal right or privilege, such as filing a workers' compensation claim; or (iv) reporting to a public authority criminal activity of the employer.

*Ryan*, 972 P.2d at 408 (citations omitted).

¶ 10 The third category of conduct, exercising a legal right or privilege, poses analytical challenges different from, and generally greater than, the others. An employer owes a duty to an employee, independent of any duty imposed by the contract of employment, not to exploit the employment relationship by demanding that an employee choose between continued employment and violating a law or failing to perform a public obligation of clear and substantial public import. *Peterson*, 832 P.2d at 1284.[4] The employer's

---

4. *See also Tameny v. Atl. Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (employee discharged for refusing to engage in illegal price fixing); *Trombetta v. Detroit, Toledo & Ironton R.R.*, 81 Mich.App. 489, 265 N.W.2d 385 (1978) (employee discharged for declining to

legal duty emanates from the recognition that the extortionate use of termination to coerce an employee to commit unlawful acts or avoid public obligations serves no legitimate economic objective and corrodes civil society.

¶ 11 By contrast, an employer's insistence that an employee relinquish a legal right or privilege, even a right or privilege which carries strong public policy credentials, will not expose the employee to possible criminal penalties or other legal sanctions. In most cases, such demands by an employer will not thrust the employee between conflicting imperatives of wage earning and responsible citizenship. The analysis of whether the public policy exception applies to a particular legal right or privilege will frequently require a balancing of competing legitimate interests: the interests of the employer to regulate the workplace environment to promote productivity, security, and similar lawful business objectives, and the interests of the employees to maximize access to their statutory and constitutional rights within the workplace. When an employee, like the employees here, seeks protection within the exercise of a legal right or privilege category of the public policy exception, both the employer and the employee may appeal to public policy in aid of their cause.

¶ 12 "Public policy" is the label we attach to those shared expectations and standards of conduct which have acquired both widespread and deeply held allegiance among the citizenry generally. Public policy emanates from, and is shaped by, many forces, including, for example, religious doctrines, political ideologies, scientific discoveries, demographic shifts, and the ever-expanding pace and power of communication. We confer the elevated status of a public policy on a right that we have deemed essential to our way of life, the architecture of the institutions of government, or the distribution of governmental power. Our most fundamental and least ephemeral expressions of public policy are found in the Utah Constitution.

¶ 13 Accordingly, those who claim, like the employees in this case, that the right to keep and bear arms is a clear and substantial public policy can point to the right's impressive constitutional and statutory pedigree. Article I, section 6 of the Utah Constitution states: "The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed; but nothing herein shall prevent the legislature from defining the lawful use of arms." Utah Const. art. I, § 6.

¶ 14 The legislature has exercised its article I, section 6 power to enact numerous statutes defining the scope of the lawful use and possession of firearms.[5] One statutory provision among the corps of firearms laws offers more than ample evidence that, despite its muscular claim to be one of our state's clear and substantial public policies, the right of an employee to keep and bear arms cannot supplant the right of an employer to regulate the possession of firearms by employees within the workplace environment.[6]

illegally manipulate state-mandated pollution sampling results); *O'Sullivan v. Mallon,* 160 N.J.Super. 416, 390 A.2d 149 (Ct. Law Div.1978) (employee terminated for refusing to perform medical procedure for which she was not licensed); *Harless v. First Nat'l Bank,* 162 W.Va. 116, 246 S.E.2d 270 (1978) (employee discharged for refusing to violate consumer protection law).

5. *E.g.,* Utah Code Ann. § 76–8–311.3(2)(a) (2003) (authorizing correctional or mental health facilities to enact rules that prohibit firearms from being transported to the facility); *id.* § 76–10–505.5 (prohibiting possession of firearms on school premises); *id.* § 76–10–508(1) (prohibiting the discharge of a firearm from a vehicle, across a highway, within 600 feet of a house, and other limitations); *id.* § 76–10–528 (criminalizing the carrying of a dangerous weapon while under the influence of alcohol or a controlled substance, even if the person has a concealed weapons permit); *id.* § 76–10–1505 (criminalizing the carrying of a firearm onto a bus).

6. The employees place great importance on the fact that the guns were kept and transferred in the AOL parking lot, and not in the building. Although they concede that the parking lot was leased and controlled by AOL, the employees contend that AOL yielded whatever authority it had to restrict the presence of armed employees in the workplace once an employee went outside the walls of AOL's building and entered the parking lot. The employees argue that by permitting

¶ 15 During its 2004 annual general session, the legislature enacted a chapter of the Utah Code known as the "Uniform Firearms Laws." Utah Code Ann. §§ 63–98–101, –102 (2004).[7] This statute states:

(1) The individual right to keep and bear arms being a constitutionally protected right under Article I, Section 6 of the Utah Constitution, the Legislature finds the need to provide uniform civil and criminal firearm laws throughout the state.

(2) Except as specifically provided by state law, a local authority or state entity may not:

(a) prohibit an individual from owning, possessing, purchasing, selling, transferring, transporting, or keeping a firearm at the individual's place of residence, property, business, or in any vehicle lawfully in the individual's possession or lawfully under the individual's control; or

(b) require an individual to have a permit or license to purchase, own, possess, transport, or keep a firearm.

(3) In conjunction with Title 76, Chapter 10, Part 5, Weapons, this section is uniformly applicable throughout this state and in all its political subdivisions and municipalities.

(4) All authority to regulate firearms is reserved to the state except where the Legislature specifically delegates responsibility to local authorities or state entities.

(5) Unless specifically authorized by the Legislature by statute, a local authority or state entity may not enact, establish, or enforce any ordinance, regulation, rule, or policy pertaining to firearms that in any way inhibits or restricts the possession or use of firearms on either public or private property.

(6) As used in this section:

(a) "firearm" has the same meaning as defined in Subsection 76–10–501(9); and

(b) "local authority or state entity" includes public school districts, public schools, and state institutions of higher education.

(7) Nothing in this section restricts or expands private property rights.

*Id.* § 63–98–102.

¶ 16 The statute was sponsored by Senator Michael Waddoups. During the floor debate on the bill, Senator Waddoups stated that the bill's sole purpose was to preempt efforts by the University of Utah to restrict the possession of firearms on its campus, in defiance of what Senator Waddoups understood to be a clear legislative mandate to the contrary. Utah State Senate, Floor Deb. on S.B. 48, 55th Utah Leg., Gen. Sess. (Feb. 16, 2004) (Tape No. 26).

¶ 17 Senator Gregory Bell expressed concern over the bill's effect on private property

---

employers to prohibit employees from storing firearms in automobiles, employers would be "disarming" employees by making it impractical to carry their weapons in their automobiles. We decline to create multiple categories of an employer's property and to assign to them multiple limitations on an employer's rights to manage workplace security by imposing restrictions on firearm possession by employees. Those who are unnerved by the prospect of engaging unarmed in the human interactions that occur while in transit to and from the workplace are, of course, at liberty to seek employment in a workplace which has adopted the philosophy that a safe and productive work environment is best achieved with armed employees.

Consistent with our view that the public policy exception to the at-will doctrine should be applied parsimoniously and on a case-by-case basis, we decline to announce a categorical rule defining the limits beyond which an employer could not restrict an employee's right to keep and bear

arms without implicating the public policy exception.

7. We have no need to analyze the text of this statute because the issue before us is not one of statutory interpretation. The centerpiece of our inquiry is the strength and scope of public policy. In our effort to assay this question, we are not restricted to parsing statutory text and may properly look to many sources, including legislative history, which may illuminate the dimensions of the public policy at issue. We are not troubled by relying on legislative debate in 2004 to measure the clarity and strength of public policy relating to weapons in the workplace in September 2000 when the employees were terminated. The legislature's 2004 debates on the interplay between private property rights and the right to bear arms reflects the latest stage of the uncompleted search for equipoise between the right of persons to bear arms and the right of persons, including employers, to regulate private property.

rights. *Id.* During the course of his remarks, Senator Bell criticized the bill as potentially prohibiting employers from restricting gun possession by employees and private citizens from regulating the presence of guns within their own homes. *Id.* Other senators were wary of the possibility that the bill could be construed to limit owners of private businesses from restricting gun possession by business invitees. For example, Senator Dave Thomas expressed concern that the bill not prohibit Lagoon, a popular amusement park, from restricting the possession of firearms on its premises. Utah State Senate, Floor Deb. on S.B. 48, 55th Utah Leg., Gen. Sess. (Feb. 17, 2004) (Tape No. 28).

¶ 18 Senator Waddoups took the position that he did not intend that the bill would "in any way restrict[ ] private property rights." *Id.* He added that he did not intend to preempt restrictions on firearms possession put in place by the Delta Center, the Salt Lake City arena which is home to the Utah Jazz. *Id.*

¶ 19 Debate of the bill in the House of Representatives echoed the Senate's sensitivity to the bill's private property implications. Representative Stephen Urquhart was a particularly vigorous advocate of the preeminence of private property rights, stating that it was the intention of the bill that private property rights govern. Utah State House of Representatives, Floor Deb. on S.B. 48, 55th Utah Leg., Gen. Sess. (Feb. 26, 2004) (Tape No. 2). Representative Urquhart remarked that the bill does not affect private property rights and that the statutory language agreed upon by the committee reflected its best efforts to convey that intent. Utah State House of Representatives, Floor Debate on S.B. 48, 55th Utah Leg., Gen. Sess. (Mar. 3, 2004) (Tape No. 4). That language states: "Nothing in this section restricts or expands private property rights." Utah Code Ann. § 63–98–102(7).

¶ 20 This debate amply captures the tension between two familiar antagonists: the right to regulate one's own private property and the right to keep and bear arms. Our task is to determine whether the right to keep and bear arms in Utah is a public policy

which is so clear and substantial as to supersede an employer's attempt to restrict weapons in the workplace by contract. We hold that it does not. We read the language of section 63–98–102(7) to indicate that the legislature has purposefully declined to give the right to keep and bear arms absolute preeminence over the right to regulate one's own private property.

¶ 21 The employees attempt to add heft to their argument that their right to possess firearms is sufficiently substantial to overcome the at-will doctrine with citations to anecdotal evidence that private and public security is better safeguarded by an armed citizenry. According to the employees, Utah's Constitution and statutes have so embraced this doctrine of peacekeeping that fundamental protections of private property must give way to it. The debates within our legislature suggest otherwise.

¶ 22 The legislative debates over section 63–98–102 suggest that to the extent Utah has a "clear and substantial" public policy relating to the possession of firearms, public policy does not implicate an employer's right to restrict firearms in a parking lot leased by the employer and to terminate an at-will employee for violating that prohibition. Thus, in keeping with our view that the public policy exception may be invoked only sparingly in circumstances where the cause of an employee's discharge implicates a public policy of such clarity and substance to impose on the employer a legal duty independent of contract rights inherent in the at-will doctrine, we affirm the judgment of the trial court.

¶ 23 We acknowledge that the legislature has enacted statutes which give practical effect to the mandate of article I, section 6. *See, e.g., id.* § 76–10–500(1)(a) (stating that a citizen shall not be prohibited from owning, possessing, purchasing, selling, transferring, transporting, or keeping any firearm at his place of residence, property, business, or in any vehicle lawfully in his possession); *id.* § 76–10–505.5 (prohibiting the carrying of firearms in school zones, on buses, or in bus terminals without a concealed weapons permit); *id.* § 76–10–530 (permitting private residences and houses of worship to prohibit

those carrying firearms from entering); *id.* § 76–10–530(5) (prohibiting lessors from restricting lessees from possessing a firearm in their residence). The employees argue that each of these statutes reflects the legislature's intent that the right to keep and bear arms should be considered a clear and substantial public policy.

¶ 24 However, we confront here the unique situation in which the very claim to the public policy exception sought by the employees has been taken up and debated by the legislature. We are not asked to measure the clarity and substance of a public policy exception candidate and compare it for the first time with the rights of an employer. The legislature in its role as the primary institutional source of public policy has done this work for us. The ambivalence of the outcome of its labors directs us to our determination that the employees may not use the public policy exception to overcome the at-will doctrine.

## CONCLUSION

¶ 25 There remains an evolving discussion about the role of firearms in our society. While certain areas of that debate are more developed than others, the mature at-will employment law in the state of Utah rejects the idea that, in the face of a freely entered-into agreement to the contrary, an employee has the right to carry a firearm on his employer's premises.

¶ 26 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.