*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 63**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DAVID K. PANG,
*Appellant,*

*v.*

INTERNATIONAL DOCUMENT SERVICES; PROGRESSIVE FINANCE; and
MANAGEMENT INCORPORATED,
*Appellees.*

No. 20120983
Filed: August 5, 2015

Third District, Salt Lake
The Honorable William W. Barrett
No. 120904043

Attorneys:

David K. Pang, Salt Lake City, appellant pro se

Jason Boren, Karen M. Clemes, and Tyler Hawkins, Salt Lake City,
for appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM, JUSTICE PARRISH, and
JUDGE BLANCH joined.

JUSTICE NEHRING did not participate herein due to his retirement;
THIRD DISTRICT COURT JUDGE JAMES T. BLANCH sat.

JUSTICE DENO G. HIMONAS became a member of the Court on
February 13, 2015, after oral argument in this matter, and
accordingly did not participate.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1   This case requires us to determine whether rule 1.13(b) of
the Utah Rules of Professional Conduct reflects a clear and
substantial public policy of the kind sufficient to prevent companies
from terminating in-house legal counsel for reporting illegal activity
to management. David K. Pang, an attorney, filed a complaint

against his employer alleging that he was terminated for refusing to ignore the company's violation of several states' usury laws. He asserted that the company had effectively asked him to violate the Utah Rules of Professional Conduct in order to keep his job. The district court dismissed his complaint, concluding that Mr. Pang was an at-will employee and that his firing did not violate a clear and substantial public policy of the State of Utah. We affirm the district court's decision. Rule 1.13(b) does not constitute a clear and substantial public policy that prevents the termination of an at-will employee. And even if it did, other rules of professional conduct evince strong policy choices that favor allowing clients to terminate the attorney-client relationship at any time, including firing an in-house lawyer with whom an organizational client disagrees.

¶2　Mr. Pang also argues that the district court improperly dismissed his claims without holding an oral hearing. The Utah Rules of Civil Procedure require district courts to grant a litigant's request for a hearing on a dispositive motion unless the motion is frivolous or the issue has been authoritatively decided. We agree with Mr. Pang that his opposition to the motion was not frivolous and the issues had not been authoritatively decided, so the district court erred when it denied his request for a hearing. But because Mr. Pang has not identified any substantive argument he would have raised if his request had been granted, we conclude that the error was harmless. We note, however, that because a rule 12(b)(6) dismissal is generally not a judgment on the merits and the district court did not dismiss the complaint with prejudice, nothing in our decision precludes Mr. Pang from filing a new complaint.

## Background

¶3　On appeal from a motion to dismiss, we must accept the factual allegations in the complaint as true[1] and view all reasonable inferences from them in the light most favorable to the plaintiff.[2] We outline the pertinent facts consistent with this standard.

¶4　Between 2009 and 2012, Mr. Pang worked as a compliance officer for Internal Document Services (IDS) and Progressive Finance. Resource Management Incorporated (RMI) also hired Mr. Pang in 2012, becoming a "co-employer" with the other two companies. IDS promoted Mr. Pang to in-house counsel in 2011,

---

[1] *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 2, 243 P.3d 1275.

[2] *Moss. v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 3, 285 P.3d 1157.

making him responsible for its compliance with state regulatory requirements in several different jurisdictions. Mr. Pang apparently worked in this same capacity for the other two companies. Because the relationship between these three entities is not relevant to the merits of the issues presented on appeal, we will refer to them collectively as "the Company" throughout this opinion.

¶5 Beginning in September 2011, Mr. Pang became concerned that the Company was violating "usury laws in numerous states by charging an interest rate above statutory limits and not registering as a loan institution." He warned the Company's owners "repeatedly" that these oversights "rendered their out of state practice illegal." Mr. Pang "made a final attempt to convince" the Company of its "illegal lending practices" in May 2012. He "printed, and took home, loan contracts from different states in order to develop a spreadsheet report to show the specific number of . . . usury violations." Two weeks later, the Company fired Mr. Pang "for taking home documents," citing a provision of the employee handbook that prohibited such conduct. "[A]t the time of his termination," Mr. Pang learned "for the first time" that "the owners were aware of the problems but did not plan to correct" them. And he "was told to ignore" the Company's "non-compliance."

¶6 According to Mr. Pang, the "real reason" for his termination was "the fear that [he] would expose [the Company's] illegal activities, and to punish and intimidate him into silence." He sued the Company for wrongful termination, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. With respect to the wrongful termination claim, Mr. Pang alleged that his termination "violated the public policy of the State of Utah and the Rules of Professional Conduct" because the Company fired him for "(1) refusing to be unethical, (2) [refusing] to break the law by complying with their illegal activities, [and] (3) refusing [the Company's] orders to ignore their illegalities."[3]

¶7 The Company moved to dismiss the complaint under rule 12(b)(6) of the Utah Rules of Civil Procedure. After determining that a "hearing was requested but . . . not necessary" to rule on the

---

[3] Mr. Pang also alleged that he had an implied contract of employment and was not an at-will employee. The district court dismissed this claim, and he has not challenged that decision on appeal.

motion, the district court dismissed all of Mr. Pang's claims. He appeals. We have jurisdiction under Utah Code section 78A-3-102(3).

**Standard of Review**

¶8 Mr. Pang argues that the district court should have granted his request for a hearing before ruling on the motion to dismiss. Whether a litigant is entitled to a hearing on a dispositive motion under rule 7(e) of the Utah Rules of Civil Procedure is a question of law, which we review for correctness.[4] He also argues that the district court improperly dismissed his wrongful termination claim by concluding that his termination did not violate a clear and substantial public policy. "We review the grant of a motion to dismiss for correctness, granting no deference to the decision of the district court."[5]

**Analysis**

¶9 We first address Mr. Pang's contention that the district court erred in denying his request for a hearing. We conclude that even though the court erred in refusing to hold a hearing on the motion to dismiss, Mr. Pang has not demonstrated on appeal that the outcome of his case would have been any different absent the error, so the court's mistake was harmless. We then discuss Mr. Pang's wrongful termination claim and hold that he has not identified a clear and substantial public policy sufficient to prevent his termination. And even if he had, we conclude that other countervailing policies outweigh an in-house lawyer's right to "report up" illegal activity without fear of termination.

### I. The District Court Should Have Held a Hearing, but the Error Was Harmless

¶10 Rule 7(e) of the Utah Rules of Civil Procedure provides that the "court shall grant a request for a hearing" on a dispositive motion unless it "finds that the motion or opposition to the motion is frivolous or the issue has been authoritatively decided." Mr. Pang requested an oral hearing in his memorandum opposing the Company's motion to dismiss. In the district court's written order dismissing the complaint, it noted that a "hearing was requested," but found that it was "not necessary for the Court to decide the Defendants' Motion to Dismiss."

---

[4] *See Price v. Armour*, 949 P.2d 1251, 1254 (Utah 1997).

[5] *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275.

¶11 Mr. Pang contends that this was improper for two reasons: (1) rule 7(e) requires district courts to make explicit written findings, and (2) his opposition to the motion was not frivolous, nor had the pertinent issues been authoritatively decided, so rule 7(e) required the court to hold an oral hearing on the motion. We reject Mr. Pang's contention that rule 7(e) requires explicit oral or written findings, but we agree that in this case the court erred in denying his request for an oral hearing. Nevertheless, because Mr. Pang has failed to show that granting his request would have had any effect on the outcome of the case, we conclude that the error was harmless.

¶12 Nothing in the rules of civil procedure requires district courts to make specific written or oral findings of fact before denying a litigant's request for a hearing. Rule 7(e) provides that a district court "shall grant a request for a hearing" on a dispositive motion "unless the court finds that the motion or opposition to the motion is frivolous or the issue has been authoritatively decided."[6] But the rules also provide that a court "need not enter findings of fact and conclusions of law in rulings on [non-dispositive] motions."[7] And with respect to orders on dispositive motions, the rules require nothing more than "a brief written statement of the ground for [the court's] decision" only "when the motion is based on more than one ground."[8] Here, a request for a hearing under rule 7(e) is not a dispositive motion, and Mr. Pang has not offered any reason why the "brief statement" rule should apply to hearing requests or why such requests should be treated any differently than ordinary motions. We therefore conclude that rule 7(e) does not require district courts to enter specific findings before denying a request for a hearing.

¶13 Even though the court had no obligation to make explicit findings before refusing to hold a hearing, we agree with Mr. Pang that the court erred because it does not appear that his opposition to the Company's motion was "frivolous" or that the pertinent issues had been "authoritatively decided."[9] We have not yet interpreted the terms "frivolous" or "authoritatively decided" in rule 7. But in other contexts, we have indicated that an argument is "frivolous" if it is

---

[6] UTAH R. CIV. P. 7(e).

[7] *Id.* 52(a).

[8] *Id.*

[9] *See id.* 7(e).

"obviously without merit" or has "no reasonable likelihood of success."[10] Likewise, the Utah Rules of Appellate Procedure state that a frivolous appeal is "one that is not grounded in fact, not warranted by existing law, or not based on a good faith argument to extend, modify, or reverse existing law."[11] This is a high bar. Even bad arguments are not necessarily frivolous—we sanction attorneys for frivolous appeals only in the most "egregious cases" where an obviously meritless appeal "result[s] in the delay of a proper judgment."[12]

¶14 Mr. Pang's arguments before the district court do not meet this standard. The court acknowledged in its written order that Mr. Pang's wrongful termination claim was not completely unfounded. As we discuss in more detail in part II of this opinion, to withstand dismissal on his wrongful termination claim, Mr. Pang needed to allege that a clear and substantial public policy prohibited his firing.[13] And to meet this standard, a policy must be reflected in sources of law that we have recognized as an authoritative statement of state public policy, like a judicial decision.[14] Mr. Pang argued that the Company fired him for making an internal report of illegal activity as required by the Utah Rules of Professional Conduct. The district court acknowledged that the rules were "[a]rguably 'judicial decisions'" that could qualify as an authoritative source of state public policy. But the court ultimately concluded that ruling in Mr. Pang's favor would be "acting outside its role" because "there is no public policy that is plainly defined by legislative enactments, constitutional standards, or judicial decisions that apply to this case."

¶15 Thus, the court seems to concede in its order that Mr. Pang's argument was not frivolous, in that an issue of first impression that could "arguably" go the plaintiff's way cannot be said to be a claim that is "not warranted by existing law, or not based on a good faith argument to extend, modify, or reverse existing law."[15] There are

---

[10] *Redd v. Hill*, 2013 UT 35, ¶ 28, 304 P.3d 861 (internal quotation marks omitted).

[11] UTAH R. APP. P. 33(b).

[12] *Redd*, 2013 UT 35, ¶ 28 (internal quotation marks omitted).

[13] *See infra* II.A.

[14] *See infra* II.A.

[15] *See* UTAH R. APP. P. 33(b).

certainly problems with Mr. Pang's wrongful termination claim that we discuss later in this opinion. But it is difficult to see how the court determined that it was "frivolous" or "authoritatively decided" by existing precedent when the order dismissing the claim seems to acknowledge otherwise. Accordingly, we conclude that the district court erred in denying Mr. Pang's request for a hearing on the motion to dismiss.

¶16 But even though Mr. Pang was entitled to a hearing, that error alone is insufficient to justify reversal. A court's erroneous refusal to grant a requested hearing does not warrant reversal unless there is a "reasonable likelihood that it affected the outcome of the case."[16] For example, in *Price v. Armour*, we held that the erroneous denial of a litigant's request for a hearing on a motion for summary judgment was harmless error because the litigant failed to show "that he would have made new or additional arguments at the hearing that were not covered by his memorandum of points and authorities."[17] Consequently, the litigant could not show that there was any reasonable likelihood that a hearing would have affected the outcome of the case, so reversal was not justified.[18]

¶17 Like the litigant in *Price*, Mr. Pang has not identified any substantive arguments he would have made at a hearing had the court granted him one. Instead, he asserts that he would have "made an oral motion to amend his complaint" if, "after oral arguments[,] the District Court found his Complaint still to be lacking." But Mr. Pang overlooks the fact that he could have amended his complaint at any time without asking the court's permission. Rule 15(a) allows a party to "amend his pleading once as a matter of course at any time before a responsive pleading is served."[19] Here, the Company moved to dismiss the complaint without ever filing an answer, and under our caselaw, a "motion to dismiss is not a responsive pleading."[20] Moreover, even after the court dismissed his complaint, Mr. Pang

---

[16] *Price v. Armour*, 949 P.2d 1251, 1255 (Utah 1997); *see also* UTAH R. CIV. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

[17] 949 P.2d at 1255–56.

[18] *Id.*

[19] UTAH R. CIV. P. 15(a).

[20] *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 24, 243 P.3d 1275.

could have moved to reopen the judgment under rule 59 or rule 60 of the Utah Rules of Civil Procedure.[21]

¶18 Accordingly, Mr. Pang's ability to amend his complaint did not hinge on whether the court granted his request for an oral hearing, so he has failed to advance any reason why the error affected the outcome of his case. And for that reason, the court's erroneous denial of his hearing request was harmless error.

¶19 We note, however, that while Mr. Pang was not prejudiced by the district court's denial of his request for a hearing, the district court did not dismiss his complaint with prejudice. Under our caselaw, the "general rule" is "'that a dismissal under [r]ule 12(b)(6) . . . is not final or on the merits.'"[22] Consequently, nothing in our decision prevents Mr. Pang from filing a new complaint.

## II. The District Court Properly Dismissed Mr. Pang's Wrongful Termination Claim

¶20 Having concluded that the denial of Mr. Pang's request for a hearing was harmless error, we now turn to his wrongful termination claim. In Utah, all employment relationships are presumed to be at-will, meaning that the employer can terminate the relationship at any time for any reason, or no reason at all.[23] There

---

[21] *See Nichols v. State*, 554 P.2d 231, 232 (Utah 1976) (stating that after an order of dismissal, a plaintiff may "move under [r]ules 59(e) or 60(b) to reopen the judgment" to file an amended complaint); *Nat'l Adver. Co. v. Murray City Corp.*, 2006 UT App 75, ¶ 15, 131 P.3d 872 (noting that courts have discretionary power to treat a motion to amend a complaint filed after dismissal "'as including a rule 59(e) motion to amend judgment or a rule 60(b) motion for relief from judgment'" (quoting *Combs v. PricewaterhouseCoopers LLP*, 382 F.3d 1196, 1205 (10th Cir. 2004) (quoting 3 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 15.12[2] & n.19 (3d ed. 2004)))).

[22] *Alvarez v. Galetka*, 933 P.2d 987, 991 (Utah 1997) (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (2d ed. 1990)); *see also Carlton v. Brown*, 2014 UT 6, ¶ 14 n.5, 323 P.3d 571 (noting that dismissal under rule 12(b)(6) "generally is not final or on the merits and the court normally will give plaintiff leave to file an amended complaint except in situations where it appears to a certainty that plaintiff cannot state a claim, in which case dismissal with prejudice is appropriate" (internal quotation marks omitted)).

[23] *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 7, 96 P.3d 950.

are several exceptions to the at-will employment doctrine.[24] The exception at issue in this case applies when "the termination of employment constitutes a violation of a clear and substantial public policy."[25] To state a claim under the public policy exception to at-will employment, Mr. Pang must allege "(i) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that [Mr. Pang's] conduct brought the policy into play; and (iv) that the discharge and the conduct bringing the policy into play are causally connected."[26]

¶21 Mr. Pang characterizes the wrongful termination issue as whether Utah law should *ever* permit an in-house lawyer to bring a wrongful termination claim. This is a matter of first impression in Utah. Other state supreme courts have held that in-house counsel can bring wrongful termination claims, but they limit the extent to which the plaintiff can rely on confidential attorney-client communications to support them.[27] Mr. Pang urges us to follow these decisions and argues that he can sustain such a claim for two reasons: (1) the Company fired him for refusing to commit an illegal act, and (2) he was fired for reporting illegal activity to his superiors under rule 1.13(b) of the Utah Rules of Professional Conduct.

---

[24] We have recognized three exceptions to at-will employment: "(1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of [some] agreed-upon condition; (2) a statute or regulation restricts the right of an employer to terminate an employee under certain conditions; or (3) the termination of employment constitutes a violation of a clear and substantial public policy." *Id.* (alteration in original) (internal quotation marks omitted).

[25] *Id.* (internal quotation marks omitted). In his memorandum opposing the Company's motion to dismiss, Mr. Pang argued that other exceptions to the at-will employment doctrine barred his termination. The district court rejected these arguments, and he has not challenged that decision on appeal.

[26] *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 404 (Utah 1998) (footnote omitted).

[27] *See, e.g.*, *Gen. Dynamics Corp. v. Superior Court*, 876 P.2d 487, 493–94, 496–504 (Cal. 1994) (explaining the California rule and discussing the approach taken in other jurisdictions).

¶22 We do not reach the broader question of whether an in-house lawyer may ever bring a wrongful termination claim, because even if such a claim existed in Utah, Mr. Pang has not identified a constitutional provision, statute, or judicial decision that amounts to a "clear and substantial" public policy to support a claim under the circumstances of this case. And even if he had, rule 1.13 and other rules of professional conduct express strong countervailing policy interests that outweigh any policy Mr. Pang raises in this case.

*A. Mr. Pang's Complaint Does Not Implicate a State Public Policy of Sufficient Magnitude to Qualify as an Exception to At-Will Employment*

¶23 On appeal, Mr. Pang has conceded that he was an at-will employee. But he argues that his firing falls within an exception to the at-will employment doctrine because he was terminated in "violation of a clear and substantial public policy."[28] Courts often use the term public policy as a broad reference to anything that "has a tendency to be injurious to the public, or against the public good."[29] But in the context of a wrongful termination claim, the term encompasses considerations that are "much narrower than traditional notions of public policy."[30] This is by design—by cabining the scope of the public policy exception, we "avoid unreasonably eliminating employer discretion in discharging employees."[31] Accordingly, to support a wrongful discharge claim under the public policy exception, Mr. Pang's complaint must identify a public policy "so clear and weighty," and as to which "the public interest is so strong" that the policy should be "place[d] . . . beyond the reach of contract."[32]

¶24 To make this determination, we consider a number of factors: (1) whether the policy at issue is reflected in authoritative

---

[28] *Hansen*, 2004 UT 62, ¶ 7 (internal quotation marks omitted).

[29] *See Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1043 (Utah 1989) (internal quotation marks omitted).

[30] *Rackley v. Fairview Care Ctrs., Inc.*, 2001 UT 32, ¶ 15, 23 P.3d 1022.

[31] *Ryan*, 972 P.2d at 405.

[32] *See Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 13, 148 P.3d 945 (internal quotation marks omitted); *see also Hansen*, 2004 UT 62, ¶¶ 10–11; *Ryan*, 972 P.2d at 404–06.

sources of state public policy,[33] (2) whether the policy affects the public generally as opposed to the private interests of the employee and employer,[34] and (3) whether countervailing policies outweigh the policy at issue.[35] Below, we discuss each factor and conclude that rule 1.13 does not reflect a public policy of sufficient magnitude to qualify as an exception to the at-will employment doctrine.

1. Mr. Pang has not raised a policy that is adequately reflected in the kind of sources we have recognized previously as authoritative expressions of Utah public policy

¶25 First, the facts pled in Mr. Pang's complaint do not implicate a public policy defined with sufficient clarity in the types of sources we have recognized as authoritative expressions of Utah public policy. By "sources," we do not refer to particular institutions or public officials, but rather the laws they produce that have state-wide application. In other words, we generally will not recognize a policy as an exception to at-will employment unless it is "plainly defined" in authoritative sources of state law, such as "legislative enactments, constitutional standards, or judicial decisions."[36] We have also stated that "our case law does not allow for administrative regulations alone to constitute expressions of clear public policy," though regulations may provide some "support to a legislatively or judicially created public policy."[37]

¶26 In this case, Mr. Pang relies on four categories of public policy exceptions we have previously recognized in our caselaw: an employer may not terminate someone for (1) refusing to commit an illegal act, (2) performing a public obligation, (3) exercising a legal

---

[33] *Touchard*, 2006 UT 71, ¶ 12. As we explain in more detail below, we have recognized federal law and the laws of other states as the type of authoritative sources that may reflect Utah public policy. We have cautioned, however, that "[a]lthough many state and federal laws . . . reflect Utah public policy, and may, in fact, provide a source of Utah public policy, a plaintiff must establish a connection between" the federal or state law "and the public policies of Utah" to establish an exception to the at-will rule. *Peterson v. Browning*, 832 P.2d 1280, 1283 (Utah 1992).

[34] *Touchard*, 2006 UT 71, ¶¶ 13–14, 18.

[35] *Hansen*, 2004 UT 62, ¶¶ 10–11.

[36] *Ryan*, 972 P.2d at 405.

[37] *Rackley*, 2001 UT 32, ¶ 27 & n.8.

right or privilege, or (4) reporting illegal activities to a public authority.[38] We conclude that Mr. Pang's reliance on the first category is misplaced because the allegations in his complaint are legally deficient and he also failed to preserve any argument that he refused to commit an illegal act. Additionally, his claims under the other three categories depend on establishing rule 1.13 as a clear and substantial expression of Utah public policy, and we conclude that it is not.

¶27 As a general proposition, "[p]ersons who are terminated from their employment because they refuse to engage in illegal activities that implicate clear and substantial Utah public policy considerations should be protected regardless of whether the applicable law is that of Utah, the federal government, or another state."[39] But the public policy exception does not apply simply because an employee was fired for refusing to violate a statute. Rather, the "violation of a state or federal law must contravene the clear and substantial public policy *of the state of Utah*."[40] And "[a]lthough many state and federal laws will reflect Utah public policy, and may, in fact, provide a source of Utah public policy, a plaintiff must establish the connection between the law violated and the public policies of Utah."[41] To "properly preserve" such an issue for appeal, "the issue must be raised in a timely fashion," it must "be specifically raised," and the litigant "must introduce supporting evidence or relevant legal authority."[42] Mr. Pang's "refusal to commit an illegal act claim" fails for two reasons: (1) there are no allegations in the complaint that Mr. Pang was ever asked to commit an illegal act, much less that he refused such a request, and (2) he failed to preserve any argument based on out-of-state statutes he claims the company violated.

¶28 The factual allegations in Mr. Pang's complaint do not suggest that the Company ever asked him to commit an illegal act prior to his termination. In both the complaint and his memorandum opposing the motion to dismiss, Mr. Pang alleges generally that he was terminated for "refusing . . . to break the law by complying with

---

[38] *Touchard*, 2006 UT 71, ¶ 6 (internal quotation marks omitted).

[39] *Peterson*, 832 P.2d at 1283.

[40] *Id.* (emphasis added).

[41] *Id.*

[42] *O'Dea v. Olea*, 2009 UT 46, ¶ 18, 217 P.3d 704 (internal quotation marks omitted).

[the Company's] illegal activities" and "refusing defendants' orders to ignore their illegalities." But the specific factual allegations in the complaint do not support these assertions. According to the complaint, Mr. Pang first warned the Company in September 2011 that it was "violating usury laws in numerous states by charging an interest rate above statutory limits and not registering as a loan institution." And he continued to "repeatedly warn[]" the Company's owners that "their out of state practice was illegal." After making "a final attempt to convince" the Company of its "illegal lending practices" in May 2012, the company fired Mr. Pang for taking home documents, citing a provision of the employee handbook that prohibited such conduct. And according to his complaint, he was told "for the first time, *at the time of his termination*" that "the owners were aware of the problems but did not plan to correct it" and that he should "ignore their non-compliance." Thus, even accepting the allegations in the complaint as true and drawing all reasonable inferences from them in Mr. Pang's favor, the allegations are legally insufficient. Nowhere in the complaint does Mr. Pang allege that he was asked to break the law, much less that his refusal of such a request led to his termination. Accordingly, Mr. Pang has failed to state a claim that he was terminated for refusing to commit an illegal act.

¶29  In addition to the deficiency in Mr. Pang's pleadings, he also failed to preserve the argument that he was terminated for refusing to violate out-of-state statutes. He never presented the district court with the statutes he claims the company violated. They appear nowhere in the complaint or Mr. Pang's memorandum opposing the motion to dismiss. And he never specified before the district court whether these laws are criminal or civil statutes or agency regulations, nor does he discuss the penalties for violating them. "In order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue."[43] Without this information, the district court could not evaluate whether serious criminal penalties, hefty civil fines, or the nature of the violations themselves would provide a basis to determine that these laws reflect a clear and substantial Utah public policy. And as we have just noted, it was Mr. Pang's burden to furnish them.

---

[43] *See 438 Main Street v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (alteration in original) (internal quotation marks omitted).

¶30 Mr. Pang attempts to remedy this deficiency on appeal by citing laws in California, Florida, and Washington that he claims the Company violated. But because he never brought these laws to the district court's attention, we conclude that any argument based on the out-of-state statutes referenced in Mr. Pang's brief is unpreserved.[44]

¶31 Having concluded that the district court properly dismissed Mr. Pang's claim that he was terminated for refusing to commit an illegal act, we now turn to his claims on each of the other public policies we have recognized previously—exercising a legal right or privilege, performing a public obligation, or reporting illegal activities to a public authority. We begin by noting that each of these hinges on whether rule 1.13 of the Utah Rules of Professional Conduct expresses a clear and substantial public policy of sufficient magnitude to qualify as an exception to at-will employment. To make out a claim that he was improperly fired for exercising a legal right, Mr. Pang must do more than simply "point to a legal right or privilege" he exercised prior to his termination. [45] He must establish that the legal right he claims to have exercised embodies the type of clear and substantial public policy we recognize as being beyond the reach of contract.[46] Similarly, to show he was improperly fired for performing a public obligation, Mr. Pang must identify such an obligation that is founded in a clear and substantial public policy.[47]

---

[44] *See Peterson*, 832 P.2d at 1283 (noting that although federal law and other states' statutes may "reflect" the kind of "Utah public policy" sufficient to support a wrongful discharge claim, "a plaintiff must establish the connection between the law violated and the public policies of Utah"). We also note that Mr. Pang conceded at oral argument that his public policy argument before the district court hinged entirely on rule 1.13(b).

[45] *See Touchard*, 2006 UT 71, ¶ 9 ("Nevertheless, the fact that an employee can point to a legal right or privilege does not automatically mean that the employee has established a clear and substantial public policy for purposes of the exception to the at-will rule.").

[46] *See id.*

[47] *Hansen*, 2004 UT 62, ¶ 10 ("An employer owes a duty to an employee, independent of any duty imposed by the contract of employment, not to exploit the employment relationship by demanding that an employee choose between continued

(Continued)

In this regard, he argues that the Company fired him for reporting the Company's illegal activity to his superiors as required by rule 1.13. He claims he had both a legal right under the rule and an obligation to the public to make this report. And with respect to the third policy—reporting illegal activity to a public authority—Mr. Pang relies on the fact that rule 1.13 directs in-house counsel to internally report such conduct. So even though he never contacted law enforcement, Mr. Pang argues that reporting to the Company's owners amounted to a report to law enforcement because the "proper authorities" under rule 1.13 were his superiors.

¶32 As we have discussed, a policy cannot be clear and substantial unless it is recognized by an authoritative source of Utah public policy. In other words, the policy must be "plainly defined" by authoritative sources of state law, such as "legislative enactments, constitutional standards, or judicial decisions."[48] Rule 1.13 directs an in-house counsel to "refer" any "matter to higher authority in the organization" that "is a violation of a legal obligation to the organization, or a violation of law that reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization."[49] Mr. Pang argues that the rules of professional conduct qualify as an authoritative source of Utah public policy because they are both a "judicial decision" and a "constitutional standard" under article VIII, section 4 of the Utah Constitution. That section states, "The Supreme Court by rule shall govern the practice of law, including admission to practice of law and the conduct and discipline of persons admitted to practice law."[50]

¶33 We do not decide whether the rules of professional conduct qualify as "judicial decisions" that could independently establish an exception to at-will employment. This is because even if some of the rules may reflect a public policy of sufficient magnitude to override at-will employment, rule 1.13, upon which Mr. Pang exclusively relies, clearly does not. First, the rule regulates private conduct between attorneys and their clients, not matters of broad public importance. And second, the rules of professional conduct articulate

---

employment and violating a law or failing to perform a public obligation of clear and substantial public import.").

[48] *Ryan*, 972 P.2d at 405.

[49] UTAH R. PROF'L CONDUCT 1.13(b).

[50] UTAH CONST. art. VIII, § 4.

a strong, countervailing policy of allowing organizational clients to obtain the representation of their choice, and this policy outweighs any Mr. Pang has raised in this case.

## 2. Rule 1.13 regulates private attorney-client conduct, not matters of broad public importance

¶34  In addition to being defined by an authoritative source, clear and substantial public policies must be "of overarching importance to the public as opposed to the parties only."[51] Otherwise, we will not conclude that "the public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach of contract."[52] Policies that "inure[] solely to the benefit of the employer and employee" are accordingly "insufficient to give rise to a substantial and important public policy."[53] Mr. Pang has not shown that the policy he identifies in rule 1.13 meets this standard for two reasons. First, while rule 1.13, like many of the rules of professional conduct, indirectly benefits the public, its primary purpose is to regulate private conduct between a lawyer and his or her client. Second, the policy Mr. Pang urges us to adopt is not in the same class as other policies we have recognized previously as clear and substantial. Accordingly, rule 1.13 does not reflect a policy of sufficient public importance to qualify as an exception to at-will employment.

¶35  It is true that when in-house attorneys report illegal conduct to their superiors, the public reaps incidental benefits from corrective action the company might undertake to comply with the law. But rule 1.13 regulates conduct that is, at its core, a private matter between attorneys and their clients, not one of broad public concern. And in similar contexts, we have explicitly characterized an employee's duty to disclose information to an employer as "serv[ing] the private interest of the employer, not the public interest."[54]

¶36  For instance, our caselaw has established that even though the public may reap incidental benefits when a company polices its own activity through hiring compliance officers, the principal

---

[51] *Touchard*, 2006 UT 71, ¶ 13 (internal quotation marks omitted).

[52] *Id.* (internal quotation marks omitted).

[53] *Id.*

[54] *Fox v. MCI Commc'ns Corp.*, 931 P.2d 857, 861 (Utah 1997); *see also Touchard*, 2006 UT 71, ¶ 45.

benefits flow to the employer by minimizing its risk of liability.[55] For example, in *Touchard v. La-Z-Boy*, a company fired a compliance officer hired to investigate its handling of workers' compensation claims after she told management that she believed some claims were being "intentionally mismanaged."[56] We held that a worker "who has been terminated for exercising his or her workers' compensation rights has a wrongful discharge cause of action under the public policy exception."[57] But we concluded that no public policy prevented the company from firing the compliance officer.[58] We noted that the compliance officer's complaints "were all made in furtherance of her job duties" and that "[w]hile the public may benefit when an employer chooses to create [an internal monitoring] position, the creation of an investigatory or supervisory position is likely designed to serve the employer's private interests by minimizing its risk of liability."[59] And consequently, employers "are free to disagree with the findings made by such employees and terminate employees who make findings with which the employer does not agree."[60]

¶37 Similarly, in *Fox v. MCI Communications Corp.*, we concluded that an employee did not have a wrongful termination claim after she was fired for reporting her coworkers' fraudulent practice of classifying old customer accounts as new accounts to increase their pay.[61] We observed that "[a]lthough employees may have a duty to disclose information concerning the employer's business to their employer, that duty ordinarily serves the private interest of the employer, not the public interest."[62]

¶38 These cases are dispositive. Mr. Pang characterizes his in-house counsel duties as "a broad array of compliance assignments," including "ensuring that [the Company] complied with all state regulatory requirements." But like the plaintiffs in *Fox* and *Touchard*,

---

[55] *See Touchard*, 2006 UT 71, ¶ 45; *Fox*, 931 P.2d at 859.

[56] *Touchard*, 2006 UT 71, ¶ 43 (internal quotation marks omitted).

[57] *Id.* ¶ 25.

[58] *Id.* ¶ 47.

[59] *Id.* ¶ 45.

[60] *Id.*

[61] 931 P.2d at 858–59.

[62] *Id.* at 861.

he does not allege that he reported the Company's illegal activity to anyone outside the organization or that rule 1.13 required him to contact public authorities. And the fact that Mr. Pang had an ethical obligation as an attorney under rule 1.13 to take the action he did does not distinguish his case from either *Fox* or *Touchard*; the employees in both cases acted on similar legal obligations to disclose information to their employers.[63]

¶39 Moreover, rule 1.13's plain terms characterize the attorney's duty to "report up" as serving the employer's private interest, not an obligation to the public. The rule requires attorneys who suspect that their employer may be involved in illegal activity "that is likely to result in substantial *injury to the organization*" to "refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act on behalf of the organization."[64] Other provisions in the rule allow disclosure of confidential information "to the extent the lawyer reasonably believes necessary to prevent substantial *injury to the organization*."[65] And it instructs lawyers representing the employer to inform "directors, officers, [and] employees" within the organization that the lawyer represents the employer when its "interests are adverse to those of the constituents with whom the lawyer is dealing."[66] Consequently, the duty to "report up" under the rule is like the regular duty an employee might have to "disclose information concerning the employer's business to [his or her] employer,"[67] a duty we characterized in *Touchard* and *Fox* as distinctly private.[68] Accordingly, we conclude that an in-house counsel's duty to "report up" illegal activity to his or her superiors is not the type of clear and substantial public policy that qualifies as an exception to the at-will employment doctrine.

¶40 This conclusion is buttressed by the significant weight and overarching importance of other clear and substantial public policies we have recognized previously, which contrast sharply with the private nature of the policy Mr. Pang has raised in this case. As we

---

[63] *See Touchard*, 2006 UT 71, ¶ 43; *Fox*, 931 P.2d at 861–62.

[64] UTAH R. PROF'L CONDUCT 1.13(b) (emphasis added).

[65] *Id.* 1.13(c)(2) (emphasis added).

[66] *Id.* 1.13(f).

[67] *Fox*, 931 P.2d at 861.

[68] *See supra* ¶¶ 36–37.

have already discussed, Utah public policy does not allow an employer to fire someone for refusing to commit a crime or for reporting illegal activity to law enforcement.[69] This is because of the substantial benefits such policies confer on the public at large. Criminal codes are "designed to protect both society at large and specific individuals from antisocial acts," and the law therefore "ought not to allow those prohibitions to be circumvented by employers who seek to secure an objective prohibited by the criminal law while avoiding a technical violation . . . because of the means used."[70] Likewise, "[t]he public policies embedded in the criminal laws have long been deemed of such importance that the law also encourages persons to report criminal activity to the public authorities."[71] We have also held that an employer cannot terminate anyone for attempting to exercise his or her workers' compensation rights[72] or for pressuring an employee to ignore state reporting requirements that "ensure[] the safety of financial institutions in the state."[73]

¶41 These examples share a common feature—they involve overarching statutory frameworks designed by the legislature to protect the public from bodily injury and financial harm. Mr. Pang's claim, by contrast, involves an internal report he was required to make as in-house counsel to minimize the regulatory risks of his employer's out-of-state lending practices. It would be one thing if Mr. Pang's complaint invoked other rules of professional conduct— like rule 1.6—that are designed to protect others from death, substantial bodily injury, and serious financial harm.[74] That might be

---

[69] *See Fox*, 931 P.2d at 861–62.

[70] *Id.* at 860 (internal quotation marks omitted).

[71] *Ryan*, 972 P.2d at 408 (internal quotation marks omitted).

[72] *See Touchard*, 2006 UT 71, ¶ 25.

[73] *Heslop v. Bank of Utah*, 839 P.2d 828, 837 (Utah 1992).

[74] *See* UTAH R. PROF. CONDUCT 1.6(b) (providing that lawyers may reveal confidential information to "prevent reasonably certain death or substantial bodily harm," "to prevent the client from committing a crime or fraud this is reasonably certain to result in substantial injury to the financial interests or property of another," and "to prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud").

a different case. But here, the policy Mr. Pang asks us to recognize is a distinctly private matter of attorney-client relations, an issue that is qualitatively different than other public policies we have recognized previously.

3. Any policy reflected in rule 1.13 is outweighed by other countervailing interests

¶42 Mr. Pang's claim fails for one additional reason. Even if an employee raises a policy that is plainly defined by the requisite authoritative sources and of broad importance to the public, the employer's countervailing interest in regulating its workplace environment may nevertheless outweigh the policy at issue and permit the employee's termination.[75] And here, even if an in-house counsel's duty to "report up" was clear and substantial, we are persuaded that other provisions of the ethical rules express countervailing policy interests that outweigh any Mr. Pang has raised in this case.

¶43 Two such policies are protecting a client's right to choose representation and deterring illegal conduct. And the rules strike a delicate balance between allowing clients to secure the representation of their choice and guarding against a client's use of an attorney's services to engage in criminal activity. For example, rule 1.2(a) provides that lawyers must "abide by a client's decisions concerning the objectives of representation" but cannot "assist a client[] in conduct that the lawyer knows is criminal or fraudulent."[76] Other provisions give these directives some teeth—rule 1.16 requires an attorney to "withdraw from the representation of a client" if "the representation will result in violation of the rules of professional conduct or other law."[77] And the lawyer must also withdraw if "the lawyer is discharged" by the client.[78] Comment 4 to that rule further

---

[75] *See Touchard*, 2006 UT 71, ¶ 9 ("The analysis of whether the public policy exception applies to a particular legal right or privilege will frequently require a balancing of competing legitimate interests: the interests of the employer to regulate the workplace environment to promote productivity, security, and similar lawful business objectives, and the interests of the employees to maximize access to their statutory and constitutional rights within the workplace." (internal quotation marks omitted)).

[76] UTAH R. PROF. CONDUCT 1.2(a), (d).

[77] *Id.* 1.16(a)(1).

[78] *Id.* 1.16(a)(3).

emphasizes that the client "has a right to discharge a lawyer at any time, with or without cause."[79]

¶44 Accepting Mr. Pang's argument would upset this careful weighing of two important public policies—deterring crime and protecting a client's right to choose a lawyer. If organizational clients faced a potential wrongful termination suit every time they terminate an in-house lawyer with whom they disagreed, it would be more difficult for such clients to secure the representation of their choice—and there is no doubt that a client's right to choose a lawyer occupies a position of paramount importance throughout the rules of professional conduct. Accordingly, we conclude that countervailing policies outweigh the public policy Mr. Pang has raised in this case—that an in-house counsel who "reports up" illegal activity under rule 1.13 should be shielded from the consequences of the at-will employment doctrine.

¶45 In so concluding, we recognize that in-house attorneys are situated differently than those at law firms who can withdraw from a case without becoming unemployed. That may well cause attorneys who suspect their employer is engaged in harmful, illegal conduct trepidation. We emphasize, however, the narrow scope of our decision today—we do not hold that in-house attorneys may never raise a wrongful termination claim, nor do we foreclose the possibility that an attorney fired for complying with an ethical rule, such as reporting criminal activity to public authorities under rule 1.6, could ever make out such a claim.[80] We hold only that an attorney's duty to "report up" illegal activity to an organizational client's highest authority is not founded in the type of clear and substantial public policy that qualifies as an exception to the at-will employment doctrine. We leave these broader issues to a future case that squarely presents them.

---

[79] *Id.* cmt. 4.

[80] *See id.* 1.6(b) (providing that lawyers may reveal confidential information to "prevent reasonably certain death or substantial bodily harm," "to prevent the client from committing a crime or fraud this is reasonably certain to result in substantial injury to the financial interest or property of another," and "to prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud").

**Conclusion**

¶46 We affirm the district court's decision. Even though the court erroneously denied Mr. Pang's request for a hearing, the error was harmless. Mr. Pang fails to invoke a clear and substantial public policy that would have prohibited the Company from terminating him. The specific allegations in his complaint do not support the assertion that he was terminated for refusing to commit an illegal act, and rule 1.13(b) does not, standing alone, reflect the type of public policy that qualifies as an exception to the at-will employment rule.

---